917 F.2d 927
 135 L.R.R.M. (BNA) 2801, 135 L.R.R.M. (BNA) 3246
 James TIERNEY; Patsy R. Vaillant; Ulysses Howard; William
C. Parton; John H. Cousino; John E. Jordan, Sr.; Robert
Spencer; Edwin Sommers; William C. Thompson; Robert F.
Mitro; Melvin Lykowski; Joseph P. Martin; Dale Homer;
Dale Siefke; James Lagger; James R. Porter, Sr.; Patrick
Allen, Plaintiffs-Appellants,
v.
CITY OF TOLEDO; Doug DeGood; Gene Cook; Bill Copeland;
Alice A. Lyczkowski; Ray Nies; Donna Owens; Leo Pucetti;
Max Reddish; Peter Ujvagi; Larry Brewer; David Boston;
William A. Dunn, in Their Official and Individual Capacity;
Toledo Police Patrolman's Association, Local 10, Defendants-Appellees.
 No. 88-4047.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 11, 1989.
Decided Oct. 25, 1990.
 
 Glenn M. Taubman (argued), Nat. Right to Work Legal, Defense Foundation, Springfield, Va., for plaintiffs-appellants.
 Ralph J. Lewis, Office of City of Toledo, Law Dept., Toledo, Ohio, defendants-appellees City of Toledo, Doug Degood, Gene Cook, Bill Copeland, Alice A. Lyczkowski, Ray Nies, Donna Owens, Leo Pucetti, Max Reddish, Peter Ujvagi, Larry Brewer and David Boston.
 Ted Iorio, Gallon, Kalniz & Iorio Co., Toledo, Ohio, for defendant-appellee William A. Dunn.
 Ted Iorio, Christine A. Reardon (argued), Gallon, Kalniz & Iorio Co., Toledo, Ohio, for defendant-appellee Toledo Police Patrolman's Ass'n, Local 10.
 Before JONES and NORRIS, Circuit Judges, and ENGEL, Senior Circuit Judge*.
 ENGEL, Senior Circuit Judge.
 
 
 1
 Once again we are obliged to review the latest version of the agency shop agreement developed by the Toledo Police Patrolman's Association (TPPA) as that agreement affects the rights and obligations of the nonunion members of the bargaining unit.[1] Once again we find ourselves obliged to vacate and remand, while realizing that the equitable balance intended by the Supreme Court to accommodate the philosophical and economic interests of each of the contesting parties will never enjoy the wholehearted support of either. And once again the issue is what procedures can be adopted in the agreement which will comply with the Supreme Court's mandates, most recently expressed in Chicago Teacher's Union v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), to require the non-members to contribute their fair share of monies to defray a union's cost of collective bargaining, contract administration and grievance adjustment while at the same time recognizing merit in Thomas Jefferson's belief that " 'to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical.' " I. Brant, James Madison: The Nationalist 354 (1948), quoted in Abood v. Detroit Bd. of Educ., 431 U.S. 209, 235 n. 31, 97 S.Ct. 1782, 1799 n. 31, 52 L.Ed.2d 261 (1977).
 
 
 2
 The long and short of it is that no payment of funds to the union by the dissenting non-members would be wholly satisfactory to them however much benefit they might unwontedly receive as beneficiaries of the collective bargaining agreement. Equally, no fair share calculation which requires non-members to pay less than union members pay in dues can ever be wholly satisfactory to the unions. Such differentials are bound to be noticed by the union members and to be a disincentive to continued union membership. What has happened in this case since our last remand is a rather curious circumstance. After purportedly complying with all of the commands of the Supreme Court and of our court in our earlier remand, the "fair share" calculated by the union exceeded the amount of individual union dues payable by union members. The only salvation of the non-members for this excess liability comes from the union's limit of that liability to the actual amount of dues imposed upon its own members. That such an unusual result could come to pass is surprising at best but, insists the union, results from its claim that most if not all of the nonchargeable expenses in the union budget are defrayed not from the dues imposed but from other sources of income earned or received.
 
 
 3
 As we shall demonstrate, it is not our function here to render a final accounting or strike the ultimate balance but rather to ensure that the procedures by which these conflicts are resolved sufficiently comply with Supreme Court mandates to allow the controversy to go to meaningful arbitration.
 
 I.
 
 4
 The Supreme Court has recognized that requiring nonunion employees to support the collective bargaining representative "has an impact upon their First Amendment interests" and may "interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit." Abood, 431 U.S. at 222, 97 S.Ct. at 1793 (footnote omitted); see also Hudson, 475 U.S. at 301, 106 S.Ct. at 1073. The interference with First Amendment rights, however, has been "justified by the governmental interest in industrial peace." Abood, 431 U.S. at 222, 97 S.Ct. at 1793; Ellis v. Railway Clerks, 466 U.S. 435, 456, 104 S.Ct. 1883, 1896, 80 L.Ed.2d 428 (1984) (citations omitted). Further, an agency shop agreement "has been thought to distribute fairly the cost of these activities among those who benefit, and it counteracts the incentive that employees might otherwise have to become 'free riders'--to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees." Abood, 431 U.S. at 222, 97 S.Ct. at 1793 (citations omitted).
 
 
 5
 First Amendment principles, however, prohibit a union from collecting from "dissenting employees any sums for the support of ideological causes not germane to its duties as collective-bargaining agent." See Ellis, 466 U.S. at 447, 104 S.Ct. at 1892. The constitutionality of agency shop agreements, therefore, turns upon the delicate balance between creating and implementing a system while accommodating First Amendment interests. As first stated in Abood and reiterated more recently in Hudson, the " 'objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities.' " Hudson, 475 U.S. at 302, 106 S.Ct. at 1074 (quoting Abood, 431 U.S. at 237, 97 S.Ct. at 1800).
 
 
 6
 The magistrate below ruled that the most recent version of TPPA's agency shop agreement satisfied constitutional requirements. For the reasons stated below, we affirm in part and reverse in part.
 
 II.
 
 7
 Plaintiffs, seventeen nonunion police officers, filed their complaint in this action on May 12, 1983, seeking to enjoin the collection of agency shop fees by pay-check deductions. The police officers' complaint alleged that a Toledo ordinance passed in 1983 authorizing the patrolman's union to operate as an agency shop deprived them of freedom of speech, freedom of association, and due process of law.[2] The officers similarly challenged TPPA's 1983 agency shop plan developed under this ordinance.
 
 
 8
 On March 26, 1985, Magistrate Carr upheld the constitutionality of the ordinance and TPPA's rebate procedure by entering summary judgment in favor of the defendants.[3] On appeal to this court, a panel of our court affirmed in an unpublished opinion, believing that the plan was constitutional under Abood and its progeny. See Tierney v. City of Toledo, 785 F.2d 310 (6th Cir.1986) (table) ("Tierney I "). The Supreme Court vacated that decision, however, and remanded for reconsideration in light of the Court's intervening opinion in Hudson. See Tierney v. City of Toledo, 475 U.S. 1115, 106 S.Ct. 1628, 90 L.Ed.2d 175 (1986) (mem.).
 
 
 9
 On remand, our court decided that the ordinance and TPPA's plan failed to comply with the requirements of Hudson. See Tierney v. City of Toledo, 824 F.2d 1497 (6th Cir.1987) ("Tierney II "). We concluded in our post-Hudson decision that a constitutional plan must include the following three elements:
 
 
 10
 First, Hudson requires that the union procedure for obtaining a fair share of the expense of servicing the collective bargaining agreement from nonconsenting, non-union members must "avoid the risk that dissenters' funds may be used temporarily for an improper purpose." ... Hudson's second requirement is that the union procedure must "provide[ ] non-members with [ ]adequate information about the basis for the proportionate share." ... Hudson's third requirement is that the union's plan must "provide for a reasonably prompt decision by an impartial decisionmaker."
 
 
 11
 Tierney II, 824 F.2d at 1502-03 (citations to Hudson omitted). We held that TPPA's plan failed to meet these criteria and remanded the case to the magistrate for further consideration.
 
 
 12
 After the remand from our court, on January 29, 1988, the officers filed a Renewed Motion for Summary Judgment, seeking a final declaratory judgment that the 1983 Toledo ordinance and the TPPA rebate plan were constitutionally deficient. Pursuant to a pretrial order of the magistrate,[4] TPPA filed a revised "Agency Fee Rebate Procedure" which it believed would conform with this court's most recent opinion. This "Revised Rebate Procedure" also included a proposed financial disclosure of the union's expenditures for 1987. The disclosure documents separated the union's expenses into two categories: "chargeable" expenses, which could form the basis for the agency fee, and "non-chargeable" expenses, which contained expenses dissenting non-members could not be required to help defray. The disclosure documents also included notes explaining the various expenditures and an opinion letter and affidavit from the auditors retained by TPPA to review the expenditures.
 
 
 13
 Shortly after TPPA filed the procedure and disclosed the financial data, the officers served a subpoena duces tecum on the auditors seeking information regarding the services performed for TPPA. On April 27, 1988, 123 F.R.D. 235, the magistrate quashed the subpoena, concluding that his role was to pass upon the facial constitutionality of the plan and not to pass upon the implementation of that plan. He therefore concluded that discovery "represents an invitation to the court to step across the line that demarcates its proper place in the dispute between the plaintiffs and defendants." The magistrate then permitted the officers to file objections to the procedures. On June 3, 1988, the officers filed objections to the Revised Rebate Procedure and renewed their challenge to the accompanying financial disclosure materials.
 
 
 14
 On September 21, 1988, 1988 WL 167239, the magistrate denied the officers' earlier Renewed Motion for Summary Judgment and ruled that the Revised Rebate Procedure satisfied the minimum constitutional requirements as set out in Hudson and Tierney II. On November 9, 1988, 1988 WL 134689, the magistrate granted TPPA's motion for summary judgment, incorporating into the opinion his September 21, 1988 ruling which upheld the constitutionality of the revised plan.[5]
 
 
 15
 The current appeal by the officers urges that the magistrate failed to comply with our remand. This allegation presents three primary issues for review: (1) whether the magistrate erred in quashing the subpoena and concluding that TPPA provided sufficient financial disclosure to pass constitutional muster, (2) whether an exhaustion requirement contained in the plan is constitutional, and (3) whether the magistrate erred in failing to grant to the officers a final declaratory judgment that the Toledo ordinance and the initial plan developed by TPPA were constitutionally deficient. The officers also seek a ruling on retroactive collection of agency fees.
 
 III.
 
 16
 In Tierney II, we concluded that under TPPA's prior procedures, the defendants' actions to enforce the "collection of a 'fair share' service fee from the dissenting non-union members must be stayed by appropriate injunctive relief until a constitutionally adequate plan consistent with the holdings in Abood, Hudson, and this opinion is functioning." 824 F.2d at 1507. Specifically, this court was concerned with the following infirmities in the prior plan: (1) the lack of procedures to ensure that dissenting non-members' funds were not used, even temporarily, for impermissible uses, (2) the plan lacked provisions complying with Hudson's requirement that the union provide detailed financial information verified by independent auditors, and (3) the plan failed to provide for a reasonably prompt decision by an impartial decisionmaker. 824 F.2d at 1505-06.
 
 
 17
 A review of the Revised Rebate Procedure considered by the magistrate on remand most appropriately begins with the procedure itself, which is reproduced below:
 
 AGENCY FEE REBATE PROCEDURE
 
 18
 (Revised February, 1988)
 
 I. DEFINITIONS
 
 19
 TPPA shall mean the Toledo Police Patrolman's Association.
 
 
 20
 Bargaining unit shall mean the bargaining unit represented by the Toledo Police Patrolman's Association.
 
 
 21
 Member shall mean any individual who is a member of the TPPA.
 
 
 22
 Non-member shall mean any individual who is a member of the bargaining unit represented by the TPPA, but who is not a member of the TPPA.
 
 
 23
 Membership year shall mean the twelve (12) month period beginning with February 1 of any year and ending with January 31 of the following year.
 
 
 24
 Fiscal year shall mean the twelve (12) month period beginning with January 1 of any year and ending with December 31 of the same year.
 
 
 25
 Agency Shop Fee shall mean an annually determined amount reflecting the proportion of full member dues utilized by the TPPA for collective bargaining expenses chargeable to non-members. The agency shop fee will not exceed the amount of full member dues.Objecting non-member shall mean any non-member who files a timely objection to the amount of the annually determined agency shop fee.
 
 II. NOTICE
 
 26
 On or before February 1st of each year, the TPPA will send each non-member a notice containing the following information relevant to the agency shop fee:
 
 
 27
 1) A list of the TPPA's expenditures during the preceding fiscal year, set forth by major category, and verified by a Certified Public Accountant;
 
 
 28
 2) The Certified Public Accountant's identification of whether the major category of expense, or a particular portion thereof, is chargeable to objectors;
 
 
 29
 3) The proportion of the fair share fee that is chargeable to objectors under applicable law;
 
 
 30
 4) The method used to calculate the chargeable proportion; and,
 
 
 31
 5) A copy of this procedure.
 
 
 32
 The underlying financial data will be made available for inspection, at the offices of the TPPA, upon reasonable notice, during regular business hours.
 
 
 33
 Non-members who are in the bargaining unit for only a portion of the membership year shall be provided the notice and financial disclosure materials within thirty (30) days after their date of hire, and shall be responsible for only a pro rata share of the agency shop fee.
 
 III. OBJECTION
 
 34
 Any non-member who objects to the amount of the annually determined agency shop fee must submit a written objection to the TPPA. The objection may be worded generally, and must be received by the TPPA at its offices at 1947 Franklin Ave., Toledo, Ohio, 43624 no later than March 1st of the current membership year. If one or more timely objections to the agency shop fee are received by the TPPA, all TPPA non-member agency shop fees will be placed in escrow and an arbitration hearing will be held.
 
 IV. ADVANCE REDUCTION AND ESCROW
 
 35
 Upon receipt of a non-member's objection, the TPPA will send the objecting non-member a check for the non-chargeable portion of the full year's agency shop fee as the advance reduction of the annual fee. Thereafter, periodic payroll deduction of the agency shop fee will commence in a manner consistent with Ohio Revised Code Sec. 4117.09(C). The TPPA will place the full year's agency shop fee (which will include all funds that are either "chargeable" or "reasonably in dispute") directly into a flat rate interest bearing escrow account pending the outcome of the arbitration hearing.
 
 V. IMPARTIAL FEE DETERMINATION
 
 36
 If one or more timely objections are received, the TPPA will contact the American Arbitration Association within five (5) business days of the March 1st deadline to arrange for an impartial arbitrator to decide the amount of the agency shop fee. The arbitration proceeding shall be conducted in accordance with the "AAA Rules for Impartial Determination of Union Fees," except as otherwise provided in this procedure. See Appendix A attached hereto.
 
 
 37
 All timely objections will be consolidated into one hearing per year, to be held at a location and on a date determined by the arbitrator. The fact that all timely objections shall be consolidated for hearing does not preclude appropriate objections to specific expenditures of the TPPA or any of its affiliates. The TPPA may not waive the arbitration hearing once an objection has been made.
 
 
 38
 The arbitrator shall determine the chargeable portion of the agency shop fee according to applicable law. The arbitrator shall issue his decision within thirty (30) days of the close of the hearing, but in no event later than August 1st of the membership year. Copies of the award will be distributed to the TPPA and to each objecting non-member. Following the issuance of the arbitrator's determination, the TPPA shall direct the disbursement of all funds in the escrow account, with interest, to the proper parties in accordance with the arbitrator's determination. The disbursement of funds shall be completed within ten (10) working days of the date of the arbitrator's determination.
 
 VI. EXHAUSTION OF REMEDIES
 
 39
 The objecting non-member(s) and/or the TPPA may challenge the arbitrator's determination of the agency shop fee according to law, but such challenge, if successful, shall not result in an agency shop fee greater than that determined by the arbitrator.
 
 
 40
 Any objecting non-member must exhaust the remedies provided by this procedure prior to seeking judicial review of any issues capable of resolution under this procedure.
 
 
 41
 In addition to the above procedure, TPPA disclosed expenditures for 1987. The expenses were divided into eighteen categories, which were in turn divided into "chargeable" and "non-chargeable" expenditures. These documents also included the methodology for arriving at the proposed agency fee, which TPPA set at 100% of full union dues. The statement of expenditures was also accompanied by explanatory notes and a cover letter from the auditors explaining the methodology.
 
 
 42
 The magistrate below held that the new plan satisfied the constitutional requirements developed in Hudson and Tierney II. (Orders dated November 9, 1988 and September 21, 1988). The magistrate concluded that the new plan satisfies Hudson's first requirement because the plan provides for the escrow of dissenting non-members' funds and the advanced rebate of that portion of the fee which clearly represents non-chargeable expenses. The plan therefore eliminates the risk that dissenting non-members' funds will be used for non-chargeable expenditures. (Order dated September 21, 1988, at 5-6). The magistrate also held that the plan satisfies Hudson's third requirement since it provides for the selection of an impartial decisionmaker and arbitration in conjunction with procedures developed by the American Arbitration Association. (Order dated September 21, 1988, at 7). The police officers do not dispute the magistrate's conclusions that the plan complies with the first and third requirements of Hudson.
 
 
 43
 A. Financial Disclosure.
 
 
 44
 The officers' initial arguments on appeal focus upon the magistrate's conclusion that the plan satisfies the second requirement of Hudson, regarding financial disclosure. The officers contend that TPPA failed adequately to disclose financial data which would enable them to "gauge the propriety of the union's fee." Hudson, 475 U.S. at 306, 106 S.Ct. at 1076. On this issue, the officers raise several contentions: (1) the magistrate erred in quashing their subpoena to the auditors designed to determine the level of audit performed for TPPA; (2) the disclosure of two categories of expenses, i.e., "payments to affiliated unions" and "officer and trustee expenses" was inadequate; and (3) the disclosure with respect to the revenues of the union and the methodology of the agency fee calculations was inadequate.
 
 
 45
 In Tierney II, we concluded, among other things, that the 1983 plan proffered by TPPA "contain[ed] no provision complying with Hudson's requirement that detailed financial information concerning all major categories of union expenses, including those for payments made to affiliated unions, be audited by a certified public accountant independent of the union and provided to all non-members before any fees may be collected from them." 824 F.2d at 1506. We also more fully discussed the necessary financial disclosure:
 
 
 46
 Hudson's second requirement is that the union procedure must "provide[ ] non-members with [ ]adequate information about the basis for the proportionate share." Id. In this regard the burden is upon the union to prove the proper proportion of union political expenses to total union expenditures. Id. To fulfill this burden, Hudson admonishes the union to give "potential objectors ... sufficient information to gauge the propriety of the union's fee," id. [106 S.Ct.] at 1076 (emphasis supplied), before it collects any fees from non-members.... The union's proportionate share figures for its "major categories of expenses, as well as verification by an independent auditor," must be disclosed to all non-members. Id. at 1076 n. 18. Such disclosure must include an audited, detailed accounting of local union payments to affiliated state and national labor organizations that will be used for agreement and non-agreement related purposes.
 
 
 47
 824 F.2d at 1503; accord Damiano v. Matish, 830 F.2d 1363, 1370 (6th Cir.1987). Further, the union must inform the non-members as to the amount of the service fee, as well as the method by which that fee was calculated. Damiano, 830 F.2d at 1370. "The union must therefore provide each non-union employee with adequate information in timely fashion to permit the member to enter an intelligent and informed objection to the use of his service fees if he desires." Id.
 
 
 48
 1. Auditing.
 
 
 49
 The police officers essentially make two challenges to the auditing. First, they argue that the auditor was not independent. Second, they argue that the magistrate erred in quashing their subpoena, which was designed to find out what the auditor was retained to do and what procedures the auditor used. In his April 27, 1988 Order quashing the subpoena, the magistrate concluded that at this "initial stage" of the constitutional review of the proposed procedures, discovery regarding the financial disclosure was inappropriate: "The request to take discovery at this preliminary stage and the possibility that that request, if granted, will lead to further disputes and opportunities for greater involvement by this Court raise the prospect of ever-increasing participation by the Court in the day-to-day, issue-to-issue operational activities as the plan is implemented." Further, in his order denying the reconsideration of his earlier order quashing the discovery, the magistrate concluded:
 
 
 50
 The [police officers'] objections to the contrary notwithstanding, I find that the procedures for audit and notice to the non-members to comply with the mandates of Hudson, Tierney, and the First and Fourteenth Amendments. In light of the materials submitted in support of the union's revised procedures and its response to the plaintiffs' objections, I find that the auditor appears to be sufficiently independent of the union to pass prima facie constitutional muster. Any further dispute regarding that issue is, I believe, a matter to be resolved by the arbitrator. For now, it suffices to conclude that the [police officers'] speculation about the alliance between the accountant and the union does not overcome the prima facie showing of independence that is apparent from the record before this Court.
 
 
 51
 That is, of course, among the issues that the plaintiffs wanted to examine further in their deposition of the accountant. But, in light of the restricted scope of my responsibility, and to repeat the views that I have expressed earlier, I do not have authority to adjudicate the plaintiffs' complaints about the independence of the auditor or the accuracy of his calculations.
 
 
 52
 (Order dated September 21, 1988, at 6.)
 
 
 53
 Before addressing the specific arguments on financial disclosure raised by the police officers, we must conclude that the magistrate appears to have misperceived his role in reviewing the procedures. He unnecessarily confined his review to the Revised Rebate Procedure, rather than also reviewing the adequacy of the financial disclosure documents. He therefore did not fully address the police officers' arguments that the financial documents were not adequately audited nor the argument that TPPA failed in some cases to describe or to disclose expenses adequately. This limited review, although prompted by a respect for what he perceived to be the limitation upon his own role, still fell short of what we believe was the minimal level of scrutiny at this stage of the proceedings.
 
 
 54
 First, reference to the financial disclosure documents was necessary not only because the rebate procedure incorporates these documents, but also because these documents contain the methodology used to calculate the agency fee. More importantly, Hudson admonishes that a constitutional plan must contain adequate disclosure which "would include the major categories of expenses, as well as verification by an independent auditor." 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18; see also Damiano, 830 F.2d at 1370 ("[t]he union must provide this information to each employee ... to permit the employee to evaluate the calculation of the fees in order to make a reasonable appraisal of the fees preliminary to exercising the option to enter an objection to the union's decision."). These requirements are neither precatory nor self-enforcing. Although we are sympathetic with the magistrate's wish to get this program up and running, particularly since TPPA has sought to implement a program since 1983, it is even more important to assure fidelity to the minimal requirements of adequate financial disclosure.
 
 
 55
 The magistrate understandably believed that at this stage of the proceedings he was not to oversee the actual implementation of the program. Ensuring adequate disclosure to enable a non-member to object, however, is materially different from determining whether particular expenditures are chargeable or whether the calculations and methodology therefore are acceptable. The latter questions, to be sure, are not presented at this stage of the review. As the officers acknowledge, these issues are for the arbitrator in the first instance once a non-member has objected to the propriety of the particular agency fee. The magistrate therefore was not asked to assess the chargeability of particular expenses or the propriety of the agency fee, but was asked to determine whether there is adequate information to object. He had the power to do this.[6] We now turn to the officers' specific arguments on auditing.
 
 
 56
 The officers first argue that the auditor was not independent, although they do not dispute the auditor's professional qualification as a Certified Public Accountant. As the magistrate recognized, the officers have produced no evidence to dispute the independence of the auditor. Since the officers have articulated no basis for this serious challenge to the auditor's professionalism and impartiality, the officers have failed to make a threshold showing to warrant discovery. The magistrate did not err on this issue.
 
 
 57
 Second, the officers argue that the magistrate erred in quashing the subpoena duces tecum to the auditor and his firm since they were unable to determine what the auditor was retained to do or what he actually did. The officers' first argument on this issue appears to be targeted towards the Revised Rebate Procedure itself. During oral argument, the officers' counsel was asked what specific changes in the plan the officers sought with respect to the level of audit issue. In response, counsel indicated that he would change the plan to incorporate the following: "TPPA will hire an independent CPA to perform an audit examination-level service in connection with the union's chargeable, non-chargeable, and disputed allocations of cost."
 
 
 58
 This circuit recently has held that a union need not "engage its auditors to perform the 'highest' possible level of audit service on financial information provided to payors of fair share fees who decline to join their designated exclusive bargaining representatives." Gwirtz v. Ohio Educ. Ass'n, 887 F.2d 678, 680 (6th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1810, 108 L.Ed.2d 941 (1990); see also Lehnert v. Ferris Faculty Ass'n, 893 F.2d 111 (6th Cir.1989). Gwirtz concluded that Hudson "only requires that a union's procedures for collection of fair share fees provide 'adequate' or 'sufficient' financial disclosure so that nonmember employees such as the plaintiffs may 'gauge the propriety of the union's fee.' " Gwirtz, 887 F.2d at 682 (quoting Hudson, 475 U.S. at 306, 106 S.Ct. at 1076).
 
 
 59
 Gwirtz also indicates that "an auditor's role is to verify the expenditures made by the union so as to ensure that the expenditures that the union claims it made for particular expenses were actually made for those expenses." 887 F.2d at 682 n. 3 (emphasis added) (citation omitted). The plan in this case expressly provides that TPPA "will send each non-member a notice containing ... [a] list of the TPPA's expenditures during the preceding fiscal year, set forth by major category, and verified by a Certified Public Accountant." (Revised Rebate Procedure, at 1 (emphasis supplied)). Therefore, on its face the plan would appear to comply with the auditing requirement of Hudson, as interpreted by Gwirtz.
 
 
 60
 The inquiry is not ended, however. The officers further argue that they cannot tell what the auditor was retained to do or what he actually did. The auditor's affidavit states that his firm was retained, in part, "to verify the TPPA's expenditures for the 1987 calendar year."[7] Nowhere in the auditor's affidavit or in the cover letter to the financial documents does it say that the auditor actually verified the expenditures, nor is there any indication as to what procedures were followed. Disclosure of the major categories of expenses and the methodology of the agency fee calculations means very little if the non-members cannot have some level of confidence in the verification of the expenditures. In Gwirtz, the district court held an evidentiary hearing to determine whether or not the procedures used by the auditor to verify the expenses were adequate. No such hearing was held here, however. We think this requires a remand for an evidentiary hearing to determine whether the auditor utilized adequate procedures to verify the expenditures. The magistrate retains the discretion to permit a subpoena duces tecum to issue, but it must be tailored to this narrow question.
 
 
 61
 2. Categories of Expenses.
 
 
 62
 The police officers challenge the adequacy of disclosure in two of the union's categories of expenses: (1) payments to TPPA's parent union, and (2) trustee and officer expenses. As an initial matter, the non-members do not purport in this action to challenge the "chargeable" or "non-chargeable" categorization of these expenses. Rather, they claim that these particular categories are so vague that they cannot decide intelligently whether to object.[8]
 
 
 63
 a. Payments to Affiliated Unions.
 
 
 64
 The officers argue that TPPA failed adequately to disclose the use of funds which are sent to its parent union, the International Union of Police Associations (IUPA). According to the statement of expenses, under the category of expenses entitled "Union Dues, IUPA & AFL-CIO," $8,500 was considered "chargeable" while $3,746 was considered "non-chargeable." Note 6 to these expenses provides some explanation of the breakdown:
 
 
 65
 Of each member's dues, $1.75 is paid to IUPA each month of which [$.40] or 22.9% is further passed on to AFL-CIO at the national level. The TPPA also paid $1,122 to the local county AFL-CIO. All amounts paid to the AFL-CIO, as well as $100 paid to the Northwest Ohio Joint Organizing Committee, have been considered non-chargeable.
 
 
 66
 Although the union excluded from the chargeable figures the portion of the IUPA payments which was passed on to the AFL-CIO and payments to the Northwest Ohio Joint Organizing Committee, the financial disclosure documents are devoid of any information as to how the remaining funds were spent.
 
 
 67
 Our decision in Tierney II makes clear that adequate financial disclosure "must include an audited, detailed accounting of local union payments to affiliated state and national labor organizations that will be used for agreement and non-agreement related purposes." 824 F.2d at 1503. The Supreme Court also has stated that with "respect to an item such as the Union's payment[s] ... to its affiliated state and national labor organizations, ... either a showing that none of it was used to subsidize activities for which nonmembers may not be charged, or an explanation of the share that was so used was surely required." Hudson, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18.
 
 
 68
 Although we cannot imagine a clearer mandate, the union argues that because it cannot obtain the necessary information from IUPA, it need not account for the use of these expenses prior to the officers' objections and arbitration. The union argues that once an objection is made, the union would then need to account for them before the arbitrator. The answer is simple. If IUPA cannot disclose or does not see fit to disclose to the local union how these funds are spent, then the local union may not include this $8,500 payment in its chargeable costs. Non-members are constitutionally entitled to disclosure of these payments prior to objecting so that they may evaluate the basis for an objection and consequently protect their First Amendment rights. Further, objecting non-members have a right to an advance rebate of those fees which are attributable to clearly non-chargeable expenditures. As we stated in Tierney II, "Hudson shows the Supreme Court's intention that, upon a non-member's objection, the union should not deduct any amount, for however short a time, which represents monies clearly expended for ideological purposes. The union simply cannot exact from the dissenter this proportionate amount and must instead allow him an advance reduction of that part of the union's fees immediately upon objection." 824 F.2d at 1504.
 
 
 69
 A union of course "need not provide nonmembers with an exhaustive and detailed list of all its expenditures," but the union is required to "include the major categories of expenses." Hudson, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18. On this issue, the lower court's conclusion that the financial disclosure was adequate is reversed. On remand, the union is directed to disclose these expenses or exclude them from the chargeability figures. Such disclosure is necessary if the union seeks to include these costs in its chargeability figures.
 
 
 70
 b. Officer and Trustee Expenses.
 
 
 71
 The officers also argue that TPPA failed adequately to disclose the use of funds expended to compensate officers and trustees. In the accompanying Note 4 to the "Officer and Trustee Expenses" category, the union states that "[e]ight officers of the TPPA are compensated monthly for their services. Eight trustees are paid a yearly $50 fee." With respect to this $20,200 "chargeable" item, the police officers' sole concern is that none of these expenses were allocated to the non-chargeable category even though these individuals presumably administered the political action fund. The police officers point to a similar allocation in the "Secretarial" expenses category, where the union listed $26 as non-chargeable to reflect the secretary's "very minor support of the political action fund." (Note 7 of the financial statement appended to the Revised Rebate Procedure).
 
 
 72
 The officers' contention that some of these expenses should have been allocated to the political action fund is quite a specific request. Without commenting on the chargeability or non-chargeability of the expense, an issue which the officers claim they do not raise in this appeal, TPPA's disclosure provides sufficient information for the officers to challenge this expense through arbitration.[9] The specificity with which they make their argument reinforces our conclusion that the disclosure was sufficiently adequate to enable them to make an intelligent objection.
 
 
 73
 3. Disclosure of Revenues.
 
 
 74
 The police officers also argue that the union failed adequately to disclose the methodology used to calculate the agency fee. On one level, the financial disclosure documents are adequate to determine how the union calculated the fee. The union first aggregated the total chargeable expenditures and the total non-chargeable expenditures. The union then divided the total chargeable expenditure figure of $166,020 by the total dues collected, which the union represents to be $162,138. This figure, according to the union, indicates that chargeable expenditures were 102.4% of the dues collected. From this figure, the union set the agency fee at 100% of dues. The union states in its brief that the figure was set at 100% since it acknowledges that the union may not charge dissenting non-members more than regular dues.
 
 
 75
 On another level, however, the financial disclosure is inadequate and must be supplemented. The police officers seek disclosure of the union's profit-making businesses. The disclosure of all of the union's revenues is particularly relevant here because the union asserts that its political and non-chargeable activities are entirely funded by these outside profit-making businesses. In the cover letter to the financial disclosure documents incorporated in the Revised Rebate Procedure, the auditing firm states, in part:
 
 
 76
 We have determined that the amount of dues collected was $162,138 and that the chargeable, non-chargeable, and reasonably in dispute costs and expenses as a percentage of dues collected were 102.4%, 19.6% and 0%, respectively, for a total of 122.0%.
 
 
 77
 It is our opinion that the dues collected for the year ended December 31, 1987 were used 100.0% for chargeable expenditures. The remaining chargeable expenditures (2.4%) and non-chargeable expenditures (19.6%) were financed from other income sources.
 
 
 78
 Given the conclusion that non-dues income fully financed the non-chargeable expenses, this court must hold that the union must disclose its revenues and the assumptions to support this conclusion. Exactitude of course is not necessary, particularly since the arbitrator will have the means to access further documentation should he or she find it necessary.
 
 
 79
 We should reiterate that the police officers do not at this stage challenge the specific agency fee calculations or methodology in this action, believing that once the revenues are disclosed, the methodology and specific calculations may be challenged before the arbitrator. The arbitrator presumably will assess the validity of calculating the agency fee in the manner suggested by the union--the proportion of chargeable expenditures to total dues. Although the Supreme Court has not specified what methodology a union must use to calculate the agency fee, the Supreme Court and this court have tacitly endorsed remedies based upon the proportion of total chargeable expenditures to total expenditures.[10] See, e.g., Railway Clerks v. Allen, 373 U.S. 113, 122, 83 S.Ct. 1158, 1163, 10 L.Ed.2d 235 (1963) (in reviewing an agency shop agreement developed under the Railway Labor Act, the Supreme Court suggested a "practical decree" of refunding to an employee "a portion of the exacted funds in the same proportion that union political expenditures bear to total union expenditures"); Int'l Ass'n of Machinists v. Street, 367 U.S. 740, 774-75, 81 S.Ct. 1784, 1802-03, 6 L.Ed.2d 1141 (1961) ("One remedy would be an injunction against expenditure for political causes opposed by each complaining employee of a sum, from those moneys to be spent by the union for political purposes, which is so much of the moneys exacted from him as is the proportion of the union's total expenditures made for such political activities to the union's total budget.");[11] Lowary v. Lexington Local Bd. of Educ., 903 F.2d 422, 433 (6th Cir.1990) ("Hudson leaves undisturbed the traditional rule that the proper remedy for an unconstitutional fee collection is not a refund of the total fee, but 'the refund ... of a portion of the exacted funds in the same proportion that union [non-chargeable] expenditures bear to total union expenditures....' ") (quoting Allen, 373 U.S. at 122, 83 S.Ct. at 1163); Tierney II, 824 F.2d at 1503 ("the burden is upon the union to prove the proper proportion of union political expenses to total union expenditures"); see also Abood, 431 U.S. at 239-40, 97 S.Ct. at 1801-02 (endorsing the remedies stated in Allen and Street, and concluding that although those cases "were concerned with statutory rather than constitutional violations, that difference surely could not justify any lesser relief in this case"). "Absolute precision" in the calculation of the charge to non-members of course cannot be "expected or required." Abood, 431 U.S. at 240 n. 40, 97 S.Ct. at 1802 n. 40. In light of the posture of this case and the insufficient disclosure here, we cannot comment upon whether the methodology proposed by TPPA will reflect the non-members "fair share" of the union's costs of collective bargaining, contract administration and grievance adjustment.
 
 
 80
 B. Exhaustion.
 
 
 81
 The officers argue that the magistrate erred in approving the Revised Rebate Procedure because it contains an allegedly unconstitutional exhaustion requirement. The agency shop agreement provides:
 
 
 82
 The objecting non-member(s) and/or the TPPA may challenge the arbitrator's determination of the agency shop fee according to law, but such challenge, if successful, shall not result in an agency shop fee greater than that determined by the arbitrator.
 
 
 83
 Any objecting non-member must exhaust the remedies provided by this procedure prior to seeking judicial review of any issues capable of resolution under this procedure.
 
 
 84
 (Revised Rebate Procedure, at 4.) The officers contend that the last sentence is an attempt to limit dissenting non-members' access to the courts on their constitutional claims. They therefore argue that the union may not require them to exhaust administrative remedies prior to filing suit under section 1983. See Felder v. Casey, 487 U.S. 131, 147, 108 S.Ct. 2302, 2311, 101 L.Ed.2d 123 (1988) (no requirement exists to exhaust administrative remedies when filing suit under 42 U.S.C. Sec. 1983); Patsy v. Board of Regents of Florida, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (same).
 
 
 85
 TPPA responds that it does not seek to limit the constitutional claims of the non-members: "It is not the intent of the 'exhaustion' clause to prevent the Appellants or other objectors from filing suit to redress any violation of their constitutional rights. The clause is merely intended to prevent individuals from attempting to litigate the amount of the agency fee in the Federal courts." TPPA also argues that the exhaustion clause "presumes the constitutionality of the procedure as a whole."
 
 
 86
 The officers agree with the TPPA in their brief "that issues concerning the 'chargeability versus non-chargeability' of particular union expenditures are generally ones for the 'impartial decisionmaker' in the first instance." They also claim that they do not wish to involve the federal courts in the determination of the actual amount of the fee. The parties therefore largely agree on the proper interpretation of the clause. The officers contend, however, that the clause may be misread by non-members to require exhaustion prior to raising their constitutional claims and that the clause therefore conflicts with this court's earlier mandate that an agency shop agreement "must protect the [non-members'] rights in clearly and simply understood language." Tierney II, 824 F.2d at 1505. TPPA argues, however, that the language is not ambiguous. TPPA points to language in the clause itself to demonstrate that exhaustion applies only to "any issues capable of resolution under this procedure."
 
 
 87
 A district court in this circuit recently addressed the constitutionality of a similar exhaustion clause in the context of an agency shop agreement. See Lowary v. Lexington Local Bd. of Educ., 704 F.Supp. 1456 (N.D.Ohio 1988), aff'd on other grounds, 903 F.2d 422, 433 (6th Cir.1990). In Lowary, the district court reviewed an exhaustion clause contained in an agency shop agreement developed by the Ohio Education Association. The clause provided that "[a]ny objector must exhaust the remedies provided by this procedure, and by law, before seeking judicial review of any issues capable of resolution under this procedure." 704 F.Supp. at 1469, 1475. As in this case, the plaintiffs in Lowary argued that the exhaustion requirement limits their access to federal court. On this issue, the district court stated:
 
 
 88
 The defendant Association argues that "[t]he exhaustion requirement is just another notice to potential objectors that they will lose their right to relief if they do not object according to the procedure." It is not, according to the defendant Association, a requirement that claims of violation of constitutional rights be exhausted before seeking access to courts.
 
 
 89
 The Court finds that the language in the last paragraph of the OEA's proposed procedure plan could reasonably be taken to require a nonmember to exhaust all the avenues available in a procedure plan before asserting any rights in federal court. In light of the substantial issues raised in constitutional violations, and the cited case law, the Court finds that such language in the OEA plan should be omitted.
 
 
 90
 Accordingly, the last paragraph must be omitted to meet the constitutionally minimum standards.
 
 
 91
 Lowary, 704 F.Supp. at 1469. We agree with Judge Dowd in Lowary that the exhaustion clause in this case, which largely mirrors the exhaustion clause considered in Lowary, unduly implies a limitation upon the officers' constitutional rights. Accordingly, the clause must be deleted from the plan as it currently is written.
 
 
 92
 C. Retroactivity.
 
 
 93
 The officers argue that the magistrate erred in approving the Revised Rebate Procedure and financial disclosure as the basis of retroactive agency fee collections. This court specifically declined to address the issue of "whether the union may collect the 'fair share' of expenses from the plaintiffs for the period between the enactment of the Toledo ordinance and the promulgation of a constitutional plan once such a plan is in operation." Tierney II, 824 F.2d at 1507 n. 4. The officers' argument ignores that the magistrate on remand also specifically declined to address the retroactivity issue. In his order granting defendants' summary judgment, he "express[ed] no view whatsoever about the union's entitlement to [agency fees] for prior years." The officers' contention that the retroactivity question has been already decided is therefore without foundation.
 
 
 94
 D. Final Declaratory Judgment.
 
 
 95
 The officers' last argument is that the magistrate erred in failing to grant them a final declaratory judgment that the original 1983 rebate plan and ordinance were unconstitutional. In Tierney II, we clearly found the ordinance and 1983 rebate plan constitutionally deficient. 824 F.2d at 1505. As an initial matter, the officers do not argue here that the magistrate was without power to consider a new plan on remand, nor do they argue that the magistrate should have merely entered the declaratory judgment and dismissed the case. The officers argue that the magistrate should have considered the new plan and entered a declaratory judgment in light of our prior opinion.
 
 
 96
 We find that the officers' argument on this issue is largely moot, particularly because the lower court has since granted the relief they seek. The officers admit that the primary impetus for this argument is their concern that the lack of such a judgment will affect their "prevailing party" status when they seek attorney fees. In his order determining that the officers were "prevailing parties" and granting attorney fees, however, the lower court stated that the police officers "accomplished that which they sought to attain when they filed their complaint: a judicial determination that the procedures for ensuring that agency shop dues were not used for purposes other than collective bargaining were not adequate under the Constitution." (Order dated August 28, 1989, at 5-6, 1989 WL 161543.). Therefore, not only did we clearly state in Tierney II that the 1983 procedures and ordinance violated the Constitution, but the lower court similarly stated. No more is required.
 
 
 97
 Accordingly, for the reasons stated above we AFFIRM in part and REVERSE in part. The cause is remanded, with instructions to the lower court: (1) to hold an evidentiary hearing to determine whether the audit procedures were adequate to verify the expenses; (2) to direct the union to disclose the use of funds which are sent to its parent union or to exclude this expense from the chargeability figures; (3) to direct the union to disclose the union's revenues; and (4) to direct the union to delete the exhaustion clause. In all other respects, the lower court ruling is affirmed.
 
 APPENDIX A
 
 98
 Rules for Impartial Determination of Union Fees
 
 1. Application of Rules
 
 99
 A union may obtain administration under these Rules by requesting the AAA to appoint an Arbitrator to determine the appropriate amount of a union fee in one or more of its bargaining units. These Rules shall apply subject to and in accordance with the applicable statutory law and the internal procedures of the union involved.
 
 2. Initiation of Arbitration
 
 100
 To initiate an arbitration under these Rules, a union shall notify the AAA that challenges of its fees have been received from one or more individual employees, which are to be determined by an impartial arbitrator. The letter of notification shall identify the unions involved and the names and addresses of the individuals who have challenged the union fee or who, in accordance with the organization's internal procedures, should be notified of the proceedings (hereinafter called the participants).
 
 
 101
 The letter of notification should describe the issues involved and notify the AAA of any relevant time limits contained in the applicable law or the union's internal procedures. The initiating letter may suggest an appropriate location for hearing.
 
 3. Appointment of Arbitrator
 
 102
 Upon receiving such an initiating letter, but prior to making an appointment, the AAA will select an Arbitrator from a special panel of experienced labor Arbitrators who is willing to hear and decide such issues in accordance with the applicable law and the union's internal procedures, and who is prepared to meet the applicable time limits. Thereupon, the AAA will appoint the Arbitrator to the case, notifying the union and the other participants.
 
 
 103
 4. Disclosure of Grounds for Disqualification
 
 
 104
 Prior to accepting the appointment, a prospective Arbitrator shall disclose any circumstances likely to create a presumption of bias. In its discretion, the AAA may disqualify an Arbitrator based on such disclosure. After participants in the procedure are notified of an appointment, they may challenge an Arbitrator for cause by promptly notifying the AAA of their objection.
 
 5. Vacancies
 
 105
 If any Arbitrator should resign, die, withdraw, or be unable or disqualified to perform the duties of office, the AAA may, in its discretion, declare the office vacant and appoint a substitute.
 
 6. Notification of Proceedings
 
 106
 Notice of the time and place of the arbitration hearing, as determined by the Arbitrator, will be mailed to the participants by the AAA.
 
 7. Representation by Counsel
 
 107
 Any participant may be represented by counsel or by an authorized representative.
 
 8. Stenographic Record
 
 108
 Any participant wishing a stenographic record shall make such arrangements directly with the stenographer, notifying the AAA in advance of the hearing. If such a transcript is determined by the Arbitrator to be the official record of the proceeding, it must be made available to the Arbitrator and to other participants for inspection, at a time and place determined by the Arbitrator.
 
 9. Attendance at Hearing
 
 109
 Persons having a direct interest in the arbitration are entitled to attend hearings. The Arbitrator shall have the power to require the retirement of any witness during the testimony of other witnesses. It shall be discretionary with the Arbitrator to determine the propriety of the attendance of any other persons.
 
 10. Adjournment
 
 110
 The Arbitrator for good cause shown may adjourn a hearing upon the request of a participant or upon the Arbitrator's own initiative, but must observe all applicable time limits.
 
 11. Oaths
 
 111
 The Arbitrator may require witnesses to testify under oath.
 
 12. Order of Proceedings
 
 112
 The Arbitrator shall determine how the case may best be presented so that all participants have a fair opportunity to contest the issues. The names and addresses of all witnesses and exhibits in order received shall be made a part of the record. The Arbitrator shall afford full opportunity for presentation of relevant proofs.
 
 
 113
 13. Arbitration in the Absence of a Participant
 
 
 114
 The arbitration may proceed in the absence of any individual participant who, after due notice, fails to be present or fails to obtain an adjournment. The Arbitrator shall require the union to submit such evidence as may be required for the making of a determination.
 
 14. Evidence
 
 115
 The participants may offer such evidence as they desire and shall produce such additional evidence as the Arbitrator may deem necessary to an understanding and determination of the dispute. The Arbitrator shall be the judge of the relevancy and materiality of the evidence offered and conformity to legal rules of evidence shall not be necessary.15. Evidence by Affidavit and Filing of Documents
 
 
 116
 The Arbitrator may receive and consider the evidence of witnesses by affidavit, giving it only such weight as seems proper after consideration of any objections made to its admission. Participants shall be afforded an opportunity to examine all documents submitted in the proceedings. Documents not filed with the Arbitrator at the hearing, but which are arranged to be submitted later, shall be filed with the AAA for transmission to the Arbitrator.
 
 16. Closing of Hearings
 
 117
 The Arbitrator shall determine when sufficient evidence has been submitted for an understanding and determination of the dispute. At that point, the Arbitrator may declare the hearings closed. If briefs or other documents are to be filed, the hearings may be declared closed as of a later date set by the Arbitrator. The time limit within which the Arbitrator is required to make an award shall be that contained in the applicable law and the union's internal procedures. If no specific date is fixed, the Arbitrator shall have 30 days from the close of hearings within which to make an award.
 
 17. Reopening of Hearings
 
 118
 The hearings may be reopened by the Arbitrator at will or on the motion of any participant, for good cause shown, at any time before the award is made, but if the reopening of the hearings would prevent the making of the award within the time specified in the applicable law and the union's internal procedures, the matter may not be reopened.
 
 18. Waiver of Rules
 
 119
 Any participant who proceeds after knowledge that any provision or requirement of these Rules has not been complied with, and who fails to state an objection thereto in writing, shall be deemed to have waived the right to object.
 
 19. Waiver of Oral Hearings
 
 120
 The union may provide for the waiver of oral hearings. If the participants are unable to agree as to the procedure, the Arbitrator shall specify a fair and equitable procedure.
 
 20. Extensions of Time
 
 121
 The Arbitrator for good cause may extend any period of time established by these Rules, except the time for making the award. The AAA shall notify the parties of any such extension of time and the reason therefor.
 
 21. Serving of Notices
 
 122
 Each participant shall be deemed to have consented and shall consent that any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these Rules may be served by mail to the participant's last known address or by personal service.
 
 22. Communication with Arbitrator
 
 123
 Unless the union's internal procedures otherwise provide, there shall be no communication between the participants and the Arbitrator other than at oral hearings. Written communications from the participants to the Arbitrator shall be directed to the AAA for transmittal to the Arbitrator.
 
 23. Time of Award
 
 124
 The award shall be rendered promptly by the Arbitrator and, unless otherwise specified by the applicable law and the union's internal procedures, not later than 30 days from the date of closing the hearings, or, if oral hearings have been waived, from the date of transmitting the final statements and proofs to the Arbitrator.
 
 24. Form of Award
 
 125
 The award of the Arbitrator shall be in writing and signed and shall be accompanied by a written justification of the Arbitrator's decision.25. Delivery of Award
 
 
 126
 The participants shall accept as legal delivery of the award the placing of the award or a true copy thereof in the mail by the AAA, addressed to each participant's last known address or the filing of the award in any manner which may be prescribed by applicable law and the union's internal procedures.
 
 26. Judicial Proceedings
 
 127
 Neither the AAA nor the Arbitrator is an appropriate or necessary party in judicial proceedings relating to this procedure, and neither the AAA nor any Arbitrator shall be liable to any participant for any act or omission in connection with any procedure conducted under these Rules.
 
 27. Administrative Fee
 
 128
 As a nonprofit organization, the AAA shall charge a fee payable by the union to compensate the AAA for the cost of providing necessary administrative services.
 
 28. Expenses
 
 129
 The expense of witnesses shall be paid by the party producing such witnesses.
 
 29. Arbitrator Compensation
 
 130
 The Arbitrator will be compensated by the union, in accordance with the per diem rate currently on file for that Arbitrator with the AAA, and shall be reimbursed for expenses.
 
 30. Interpretation and Application of Rules
 
 131
 The Arbitrator shall interpret and apply these Rules insofar as they relate to the Arbitrator's powers and duties. All other Rules shall be interpreted and applied by the AAA.
 
 
 
 *
 The Honorable Albert J. Engel became a senior circuit judge October 1, 1989
 
 
 [1]
 Under an agency shop agreement, a union that acts as exclusive bargaining representative may charge nonunion members, who do not have to join the union or pay union dues, a fee for acting as their bargaining representative. Chicago Teachers Union v. Hudson, 475 U.S. 292, 303 n. 10, 106 S.Ct. 1066, 1074 n. 10, 89 L.Ed.2d 232 (1986). This is the third time our court has reviewed TPPA's agency shop agreement. See Tierney v. City of Toledo, 785 F.2d 310 (6th Cir.1986) (table), vacated, 475 U.S. 1115, 106 S.Ct. 1628, 90 L.Ed.2d 175 (1986) (mem.) ("Tierney I "), on remand, 824 F.2d 1497 (6th Cir.1987) ("Tierney II ")
 
 
 [2]
 Toledo Municipal Code Sec. 2129.97 (1983) provided in part:
 In recognition of the Toledo Police Patrolman's Association's services to the bargaining unit and the Toledo Police Patrolman's Association's role in helping develop a more harmonious and stable labor relationship between the bargaining unit employees and the City, employees within the bargaining unit ... shall either become members of the Toledo Police Patrolman's Association or share in the financial support of the Toledo Police Patrolman's Association (TPPA) by paying to the TPPA a service fee not to exceed the amount of dues uniformly required of members of the TPPA.
 Although this ordinance was amended in 1985 and 1987, the quoted language has not been substantially changed. See Toledo Mun.Code Sec. 2129.06 (1987). The officers no longer challenge the constitutionality of this ordinance.
 Ohio law provides that public employees within a bargaining unit who are not members of the unit's designated exclusive bargaining representative may be required to pay a "fair share fee." Ohio Rev.Code Sec. 4117.09(C).
 
 
 [3]
 The parties consented to having this case decided by a United States Magistrate, with direct appeal to our court under 28 U.S.C. Sec. 636(c)
 
 
 [4]
 Order dated December 28, 1987
 
 
 [5]
 In the same order, the magistrate granted the officers' motion, conditioned upon the posting of a supersedeas bond, to stay the judgment of the district court pending a ruling from our court on an application for a stay of judgment pending appeal. A panel of this court held that the officers had not satisfied the criteria for an injunction pending appeal. (Order dated February 24, 1989)
 
 
 [6]
 Although the plaintiffs have brought these issues to court, we know of no reason why the dissenting non-members could not raise these issues in the arbitration in the first instance. We believe it especially important to emphasize that the arbitrator's decision "would not receive preclusive effect in any subsequent Sec. 1983 action." Hudson, 475 U.S. at 308 n. 21, 106 S.Ct. at 1077 n. 21. Since the Supreme Court has emphasized that "the courts remain available as the ultimate protectors of constitutional rights," 475 U.S. at 308 n. 20, 106 S.Ct. at 1076 n. 20, it should not be necessary for the magistrate or for us to anticipate, prior to arbitration, every conceivable form or technique of disclosure
 
 
 [7]
 The auditor in this case may have allocated the expenditures into the "chargeable" or "non-chargeable" categories. Not only does the plan so provide, but the auditor's affidavit states that the firm was retained "to allocate those expenditures into the categories of 'chargeable', 'non-chargeable' and 'reasonably in dispute.' " Gwirtz, as well as courts in several other circuits, rejected arguments that an auditor must be retained to make this legal determination. See Gwirtz, 887 F.2d at 682 n. 3; see also Ping v. National Educ. Ass'n, 870 F.2d 1369, 1374 (7th Cir.1989); Andrews v. Educ. Ass'n of Cheshire, 829 F.2d 335, 340 (2nd Cir.1987). The officers do not argue here that an auditor cannot make such an allocation. We therefore need not address the issue, except to conclude that the union clearly has the burden of defending any challenge to the allocation. Hudson, 475 U.S. at 306, 106 S.Ct. at 1075; Tierney II, 824 F.2d at 1505
 
 
 [8]
 The Supreme Court recently granted certiorari in a Sixth Circuit case involving agency shop fees. See Lehnert v. Ferris Faculty Ass'n, 881 F.2d 1388 (6th Cir.1989), cert. granted, --- U.S. ----, 110 S.Ct. 2616, 110 L.Ed.2d 637 (1990). Since Lehnert involves a challenge to specific chargeability determinations, rather than disclosure obligations, we do not need to hold this case pending that decision
 
 
 [9]
 The amount of financial disclosure a union must provide to a non-member to enable her to decide whether or not to object of course is not necessarily sufficient to determine the propriety of the agency fee. The AAA Rules for Impartial Determination of Union Fees give the arbitrator discretion to require the parties to produce information relevant to this determination. The union's disclosure obligation therefore only begins with the pre-objection phase. It is certainly in the union's interest to disclose sufficient financial data and other information about the agency fee prior to objections by non-members. Specific substantiation of the agency fee should reduce objections by non-members. Ambiguity rarely will have this effect, however, as demonstrated by the arguments in this appeal
 
 
 [10]
 In fact, TPPA's prior procedure contemplated a similar methodology, particularly since the umpire was to "determine the percentage of the TPPA's total expenditures for said membership year that was expended in support of partisan political or ideological causes...." Tierney II, 824 F.2d at 1509 (Appendix B, TPPA Agency Shop Rebate Procedure, provision 4(b) (emphasis supplied))
 
 
 [11]
 Cf. Ellis v. Railway Clerks, 466 U.S. 435, 443, 104 S.Ct. 1883, 1889, 80 L.Ed.2d 428 (1984) (indicating that the "pure rebate" approach suggested by Allen and Street was inadequate under the Railway Labor Act, but that an advanced reduction of the fees would be among the acceptable remedies)