William L. JIBSON, Patricia A. Benefiel, Robert F. Croll, Robert E. Friar, Sandra B. Lewis, James E. Lindsey, Harold M. Molter, George L. Stengren, David Stewart, and Andrew J. Warber, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

MICHIGAN EDUCATION ASSOCIATION–NEA, Defendant.

No. G89–40147CA.

United States District Court, W.D. Michigan, S.D.

Aug. 2, 1989.

Allaben, Massie, Vander Weyden & Timmer by Sam F. Massie, Jr., Grand Rapids, Mich., Raymond J. LaJeunesse, Jr., Milton L. Chappell, Nat. Right to Work Legal, Defense Foundation Inc., Springfield, Va., Early, Lennon, Fox, Thompson, Peters & Crocker by Robert A. Davidoff, Kalamazoo, Mich., for plaintiffs.

White, Beekman, Przybylowicz, Schneider & Baird, P.C. by Arthur R. Przybylowicz, James J. Chiodini, Okemos, Mich., for defendant.

## OPINION

ENSLEN, District Judge.

*Background*

This case is before the Court on defendant Michigan Education Association–NEA's March 2, 1989 Motion to Dismiss or for Summary Judgment under Rule 12(b)(6) or 56 of the Federal Rules of Civil Procedure. Defendant Michigan Education Association–NEA ("MEA") is a labor organization within the meaning of the Michigan Public Employment Relations Act ("PERA"), Mich.Comp.Laws § 423.201–423.216. The MEA is affiliated with various local associations within the State of Michigan, including the local associations

designated as exclusive bargaining representative for the plaintiffs herein and is also affiliated with the National Education Association ("NEA"). Plaintiffs in this lawsuit are nonmember employees in bargaining units that have a compulsory unionism agreement between the employer and the MEA and/or one of its affiliates. Before the Court at this time is also plaintiffs' motion for class certification under Rule 23 of the Federal Rules of Civil Procedure.

On February 14, 1989, plaintiffs in this lawsuit filed a complaint and a motion for a temporary restraining order and/or preliminary injunction to enjoin collection of service fees pursuant to the set of procedures approved by this Court in *Lehnert v. Ferris Faculty Ass'n*, 707 F.Supp. 1473 (W.D. Mich.1988). That approval came more than ten years after the *Lehnert* litigation began. *Jibson v. MEA–NEA* is a class action brought under the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983. I denied plaintiffs' motion for a temporary restraining order and set a schedule for further proceedings in this matter. In a March 22, 1989 hearing for a preliminary injunction, I heard evidence and legal argument before deciding to deny the injunction, based in significant part on the lack of merit to the underlying claim under § 1983.

A brief history is in order. The *Lehnert* litigation is over ten years old. The complaint in *Lehnert* was filed in May of 1978. The case was tried before this Court over a 12–day period during January and April 1986. In the middle of the *Lehnert* trial, the United States Supreme Court issued its decision in *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). When this Court issued its first decision in *Lehnert* in August 1986, it found the union's service fee procedures to be constitutionally deficient under *Hudson* and enjoined the defendant from collecting service fees from the plaintiffs until such time as the union adopted procedures that met the *Hudson* requirements. 643 F.Supp. 1306, 1335 (W.D.Mich.1986).

I retained jurisdiction "for the sole purpose of determining if and when the union

defendants ... adopted constitutional procedures" for the collection of service fees, at which time I would dissolve the injunction. 643 F.Supp. at 1330–35. Thereafter, the Court spent the next two and one-half years working with the parties guiding the union's procedures through a number of revisions, until January 3, 1989, when I approved the MEA's revised procedures and dissolved the injunction preventing the collection of service fees. *Lehnert v. Ferris Faculty Ass'n*, 707 F.Supp. 1473 (W.D. Mich.1988), *further proceedings*, 707 F.Supp. 1482 (1988), *further proceedings*, Opinion and Judgment, (W.D.Mich. January 3, 1989). That judgment was appealed by the plaintiffs to the United States Court of Appeals for the Sixth Circuit, Docket No. 89–1101 (January 25, 1989). One of the issues raised on appeal concerns the question of "whether the U.S. District Court should have allowed discovery of and itself reviewed the information which the union proposed to send to non-members."

In approving the union's procedures, I stated:

> At this stage of decade-long litigation, I am prepared to dissolve the injunction against defendant unions, because the policies and procedures now comport with constitutional mandates. If I believed the policy and procedures even minimally fell short of constitutionality, I would require further revision.
>
> \* \* \* \* \* \*
>
> In a careful balancing process, this Court has continually attempted to preserve the separate policies or protection of First Amendment rights and fairness in preventing free riding. I have considered both parties' requests and objections over a long litigation period, and am satisfied that any valid constitutional concerns of the past no longer exist.

*Lehnert*, No. G78–346, at 10–11 (Jan. 3, 1989). Also at that time, I denied plaintiffs in *Lehnert* their requested injunction pending appeal. The August 25, 1986 injunction that prohibited defendants from collecting service fees was also dissolved on that date. Plaintiffs also filed notice of appeal for the Court's denial of an injunction pend-

ing appeal. The Sixth Circuit Court of Appeals affirmed this Court's denial of the injunction pending appeal on February 15, 1989, just hours before I denied the *Jibson* temporary restraining order.

Thus before me now are defendant's motions for dismissal under Rule 12(b)(6) or for summary judgment and plaintiffs' motion for class certification. I will treat the first motion as one for summary judgment.

## *Discussion*

### I. *Motion for Summary Judgment*

#### A. Standard

In considering a motion for summary judgment, the narrow questions presented to this Court are whether there is "no genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." F.R.Civ. Proc. 56(c). The Court cannot try issues of fact on a Rule 56 motion, but is empowered to determine only whether there are issues to be tried. *In re Atlas Concrete Pipe, Inc.*, 668 F.2d 905, 908 (6th Cir.1982).

■■■ The moving party has a right to summary judgment where that party is able to demonstrate, prior to trial, that the claims of the plaintiff have no factual basis. *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As the Supreme Court held in *Celotex*, "... the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273. Moreover, the Court must read the allegations of the complaint in the light most favorable to the non-moving party. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983). Where, as here, the moving party has supported its motion with documentation, the non-moving party may not rest on the mere allegations or denials of the pleadings, but must set forth "specific facts showing that there is a genuine issue for trial." F.R.Civ.Proc. 56(e); *Davis v. Robbs*, 794 F.2d 1129, 1130 (6th Cir.1986).

■■■ The standard for granting a motion for summary judgment is essentially the same as that for granting a motion for a directed verdict. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party is not entitled to summary judgment where there is sufficient evidence to allow a reasonable jury to return a verdict for the non-moving party. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* 477 U.S. at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216. With this standard in mind, the Court will review the arguments presented by both parties.

#### B. § 1983 Claim

*Chicago Teachers Union v. Hudson*, 475 U.S. 292, 310, 106 S.Ct. 1066, 1078, 89 L.Ed.2d 232 (1986) set forth three vital mandates for providing union nonmembers with constitutionally adequate information related to the collection of agency fees. In *Hudson*, the Supreme Court wrote:

> We hold today that the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decision-maker, and an escrow for the amounts reasonably in dispute while such challenges are pending.

*Id.* As this Court held in *Lehnert v. Ferris Faculty Ass'n*, 707 F.Supp. 1473, 1477 (W.D.Mich.1988), "a procedure which meets only part of those requirements is constitutionally inadequate." *See also Hudson*, 475 U.S. at 309–10, 106 S.Ct. at 1077; *Damiano v. Matish*, 830 F.2d 1363, 1370–72 (6th Cir.1987).

In discussing the requirement of an "adequate explanation of the basis for the

fee," the Supreme Court in *Hudson* identified the endpoints of that duty. On the one hand, the Court stated, "Leaving the nonunion employees in the dark about the source of the figure for the agency fees—and requiring them to object in order to receive information—does not adequately protect the careful distinctions drawn in *Abood [v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) ]". *Id.* 475 U.S. at 306, 106 S.Ct. at 1075 (footnote omitted). On the other hand, "The union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." *Id.* at 307 n. 18, 106 S.Ct. at 1076 n. 18.

The actual notice defendant MEA–NEA provided to nonmembers is a packet nearly a half-inch thick, color-coded as to national, state, and local union information. An introductory letter explains the rest of the information, providing a needed outline. There is also a straightforward service fee election form included. The packet, as explained in the introductory letter, contains five major sections—Section A to Section E. Section A is the MEA's policy and procedures for objections to political-ideological expenditures, the policy and procedures I approved in *Lehnert* last January.

Section B has four parts, one through four. Section B–1 explains how the MEA representation fee is calculated. It lists twenty-nine activities and categorizes each as a chargeable or nonchargeable expense. Negotiating a collective bargaining agreement is listed as a chargeable expense, for example; contributing to a charitable organization is not. Section B–2 is an explanation of Section B–3, the MEA Service Fee Table with a clear breakdown of the reduced fee amount. On the initial page of Section B–3, a nonmember sees the auditor's opinion letter for the reduced service fee table. It states that:

> We have examined the 1988–89 reduced service fee table based on expenditures from September 1, 1987 through August 31, 1988 of the Michigan Education Association—NEA. Our examination was made in accordance with the standards established by the American Institute of Certified Public Accountants and, accordingly, included such procedures as we considered necessary in the circumstances.
>
> In our opinion, the 1988–89 reduced service fee table referred to above presents the reduced service fee for agency shop fee payors, in conformity with the measurement and disclosure criteria set forth in Sections B–1 and B–2.

The auditor's opinion letter explicitly states that the auditing examination was conducted according to standards established by the American Institute of Certified Public Accountants. Importantly, the auditor states that its findings of the union's expenditures and chargeable versus nonchargeable percentages were consistent with the measurement and disclosure criteria in Sections B–1 and B–2 of the packet. Information of similar character and quality was provided by the NEA and those local associations collecting a service fee. *See* Ex. 2, Sections C, D.

Under *Hudson,* the first constitutional prerequisite is notice of an "adequate explanation of the basis for the fee" to all nonmembers prior to the collection process. 475 U.S. at 306–07, 310, 106 S.Ct. at 1075–76, 1077–78. Adequate notice serves a number of purposes. To begin with, adequate disclosure ensures that potential objectors will be able to assess the propriety of the union's fee and decide in a reasoned fashion whether to object. *Id.* at 306, 106 S.Ct. at 1075–76. *See also Lehnert v. Ferris Faculty Ass'n,* 643 F.Supp. 1306, 1331, 1333. Adequate notice prevents unnecessary objections and gives objectors sufficient information to carry on a meaningful challenge in the arbitration process.

■ *Hudson* was clear that leaving the nonunion employees uninformed about the source of the figure for the agency fee, requiring them to object in order to receive information, is constitutionally impermissible. 475 U.S. at 306, 106 S.Ct. at 1075–76. In *Cramer v. Matish,* 705 F.Supp. 1234 (W.D.Mich.1989), the court wrote that

where nonunion employees, potential objectors, have no way other than "blind faith" to decide "whether an objection to the amount of chargeable fees is worth pursuing", notice was not constitutional under *Hudson, Tierney v. Toledo*, 824 F.2d 1497 (6th Cir.1987), or *Damiano v. Matish*, 830 F.2d 1363 (6th Cir.1987). A nonmember should not be required to use expert assistance or to acquire additional data in order to understand the basis of the fee. *Johnson v. General Motors*, 641 F.2d 1075, 1082 (2d Cir.1981). In fact an unsophisticated nonunion employee should be able to, on his own, file a written objection without further research or investigation. *Gilpin v. AFSCME*, 643 F.Supp. 733, 737 (C.D.Ill. 1986).

■ Plaintiffs here properly argue that to be adequate under *Hudson*, the whole of the information provided must be such as "to permit the [non]member to enter an intelligent and informed objection to the use of his service fees if he desires." *Damiano*, 830 F.2d at 1370. That means that the union "must identify and presumably justify the chargeable expenditures," and the categories of expenses must be relevant and "sufficiently explained to determine their nature." *Lehnert*, 643 F.Supp. at 1327, 1329, 1331; *see McGlumphy v. Fraternal Order of Police*, 633 F.Supp. 1074, 1082 (N.D.Ohio 1986). Moreover, "[r]elatively large expenditures ... should be divided into their component parts so as to demonstrate with specificity the nature of the expenditure." *Gilpin*, 643 F.Supp. at 737. *See Hudson*, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18; *Tierney v. City of Toledo*, 824 F.2d 1497, 1503, 1506 (6th Cir. 1987).

*Tierney* further defined what must be disclosed by the union before any fees can be collected or requested from nonmembers:

> ... Specifically, all non-members must receive an adequate accounting ... setting forth the major categories of the union's budgeted expenses, that enables a non-consenting employee to intelligently appraise what proportion of his dues would be allocable to the costs of negotiating and administering the collective bargaining agreement and that portion which would advance the union's ideological purposes.

Consequently, in addition to identifying "each major category in the union's budget or expenses," the disclosure must "indicate which categories comprise each component": 1) "that component undeniably for ideological purposes"; 2) that which "indisputably relates to the negotiation and administration of the collective bargaining agreement"; and 3) "the difference", *i.e.*, a " 'gray area' for many expenses that ... may be subject to dispute and hence to resolution by an impartial decisionmaker." *Id.* at 1504.

■ Plaintiffs focus their objections on the MEA's information packet. They make three major arguments as to the inadequacy of the notice actually provided to nonunion members. Plaintiffs first object to the fact that expenditures are allocated into only two components, chargeable and nonchargeable, instead of the three required by *Tierney*, 824 F.2d at 1504. They add that nowhere in the MEA's packet is there any indication that any of the activities and categories of expenses claimed as chargeable are reasonably subject to dispute as a matter of law, much less an allocation of expenses to that third component. *See* Complaint, Ex. 2 Sections B–D.

Second, plaintiffs complaint that the MEA's packet lists more than twenty functional categories of chargeable and nonchargeable activities for each level of the union, but with no dollar amounts. *See* Ex. 2 Sections B–1, C–3, and D–1. According to plaintiffs, the packet contains numerous tables and charts of expenses, allocated into chargeable and nonchargeable columns, but with no explanation of how the MEA and its affiliates got from the categories of activities to their allocations.

Third, plaintiffs say that expenditures are divided into a few large categories and line items that are neither sufficiently explanatory nor adequately subdivided for the reader to determine their functional nature. Here, in plaintiff's view, the MEA, NEA, and local information is faulty.

They state that the locals' schedules in the packet list only a small number of object line items, *e.g.*, "conferences," "advertising," and so forth, with no functional explanation, and separately divide the totals into direct and overhead expenditures and allocate them, without identifying which object expenses are direct or overhead and chargeable or not. Ex. 2 Sections D–1 to D–4. Plaintiffs maintain it is impossible to assess how and why, for example, $14,901.18 (99.83%) of the Central Michigan University Faculty Association's total expenses of $14,926.18 are considered chargeable.

Similarly, plaintiffs object to the MEA's "Reduced Service Fee Table" which they say lists only five categories (called "Divisions") of direct expenditures, ranging in amount from $331,657 to $13,752,487. Ex. 2 Section B–3. Although Section B–1 separately offers descriptions of the Divisions, plaintiffs find that these descriptions provide "no basis" for the non-member to assess, for example, how and why the MEA allocated $13,122,788 (more than 95%) of the $13,752,487 in expenses for "Uniserv" as chargeable, especially when it includes Political Action/Organizing Specialists; or how and why the MEA considered $4,328,894 of $4,415,683 (98%) of "Program services" to be chargeable, but only $3,253,294 of $3,569,851 (91%) of "Program development and support."

As to the NEA information, plaintiffs maintain that although the defendant has provided increased detail, the nonmember "must juggle three confusing and sometimes inconsistent sets of financial schedules." See Ex. 2, Section C–1, C–2. Again plaintiffs suggest that they should be informed how and why 85% of the expenditures under "Human and Civil Rights" for State/Local Project Grants" for "Preserving Public Schools and Education" are chargeable. *See* Ex. 2, Section C–2, at 21 and accompanying notes.

In their first objection, plaintiffs assert that the notice given to union nonmembers is unconstitutional because the financial information disclosed allocates expenditures into *only* two components—chargeable and nonchargeable—instead of three as "required by *Tierney*." Plaintiffs' Memorandum in Opposition to Summary Judgment, at 6 (March 22, 1989). In fact, *Tierney* does *not* explicitly mandate expenditures be disclosed in three components. The explicit language mandates two components:

> [A]ll nonmembers *must* receive an adequate accounting, certified by an independent auditor and setting forth the major categories of the union's budgeted expenses, that enables a non-consenting employee to intelligently appraise what proportion of his dues would be allocable to the costs of negotiating and administering the collective bargaining agreement *and* that portion which would advance the union's ideological purposes.

*Tierney*, 824 F.2d at 1504 (emphasis added). Thus the accounting must inform the proportion of dues allocable to one, the collective bargaining portion, and two, the ideological portion. Further into the discussion, and in the context of escrowing funds, *Tierney* states that "with regard to the difference [between collective bargaining and ideological expenditures], we conceive that *Hudson* contemplates that *to the extent* the union asserts its right to retain and to employ such monies, and the objecting non-union members dispute that right, all such monies should be held in escrow pending resolution by an impartial decisionmaker." *Tierney*, 824 F.2d at 1504 (emphasis added). The Sixth Circuit in *Tierney*, then, allows for escrowing options based on whether the union chooses to have immediate access to the collective bargaining portion of the dues. For the purposes of escrowing, the individual fee may be divided into two (clearly ideological/non clearly ideological) or three (clearly ideological/clearly collective bargaining/remaining amount) portions. *Id.*

The Sixth Circuit went on to say that there is a gray area for many expenses that may concurrently advance both or neither of the two components. According to *Tierney*, the impartial decisionmaker should expect such issues and the escrowing procedure used by the union should not automatically include a doubtful, or gray, expenditure in the non-member's fair share

service fee. While it is clear that the Sixth Circuit considered as unlikely expenditures which easily fall into two mutually exclusive components, the language speaks to the administrative decision and the escrowing procedure, but not to the constitutional minimum for notice. *Id.* (The arbitrator should be aware of "internal tension" in *Hudson* that the "gray area" may be subject to dispute.) Moreover, while it may be a bit better to use the third component in the service fee table, that is not the purpose of my inquiry today, which instead is to review the plan for its constitutional integrity.

Plaintiffs' remaining objections are equally unpersuasive. Plaintiffs complain that the Reduced Service Fee Table lists only these five divisions and that there is no way to assess "how and why" the union allocated a certain amount of chargeable and nonchargeable expenses for each division. Plaintiffs do not cite any precedent nor do they provide compelling reasons suggesting that the union should be required to demonstrate *why* it allocated a given dollar amount (or percentage) within each division as chargeable or nonchargeable. Presumably, the union personnel are experts in the jobs they perform, and providing a why for each and every allocation would simply subject the union personnel to second-guessing of their professional judgment and excessive documentation and paperwork. Certainly, that is not the intent of the *Hudson* line of cases.

Furthermore, there *is* general information provided as to *how* allocation amounts were calculated. Section B–2 lists many of the activities the union performs and categorized them as chargeable or nonchargeable. Section B–1 further explains that "MEA professional staff members are required to identify and categorize their time into major categories of chargeable and nonchargeable activities. [Then] [b]y entering expenditures into the MEA accounting system in this manner, the MEA determines the percentage of the MEA's expenditures which are made in different major categories of chargeable and nonchargeable activities." In addition, the packet explains that the overhead division was treated as chargeable in the same ratio that chargeable expenditures relate to total expenditures overall. I note too that the independent auditor has examined the data relating to the reduced service fee and has affirmed that the fee is *in conformity with the measurement and disclosure criteria in* Sections B–1 and B–2. Certainly *Hudson* and its progeny did not contemplate a system whereby the nonmembers themselves become the professional auditors.

In sum, I find the plaintiffs' demand for both more detailed and complex financial data *and* a simpler presentation to be asking too much. Besides being counterintuitive, the request ignores how the information packet serves both the sophisticated and unsophisticated reader with facts pertinent and necessary to an informed and intelligent objection to service fees. *Damiano v. Matish*, 830 F.2d 1363, 1370 (6th Cir.1987). This is accomplished without requiring or allowing the nonmembers to become the union's auditors, a result not contemplated by earlier decisions and a result expressly rejected by this Court. This is not, in my view, a "volume without substance" case as recognized by the court in *Gillespie v. Willard City Board of Education*, 700 F.Supp. 898, 902 (N.D.Ohio 1987).

My role in this most recent matter is a very specialized one. I am not to "rewrite" the plan for the parties who must operate under it. I am to evaluate carefully whether this plan meets the minimum constitutional requirements under the First and Fourteenth Amendments. I turn again to the words of the Supreme Court in *Hudson*, when in footnote 18 it stated:

> The Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but *adequate* disclosure would surely include the *major categories of expenses,* as well as *verification by an independent auditor.*

475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18 (emphasis added).

Defendant has complied with this requirement; indeed I believe it has provided more. The *Hudson* progeny have echoed the need for *adequate* disclosure of the basis for the fee. *See Tierney*, 824 F.2d at

1504; *Damiano,* 830 F.2d at 1369. I believe that the Supreme Court chose precisely the word it intended when it spoke of "adequate" disclosure. Moreover, I believe that the Sixth Circuit observed and stressed the type of disclosure contemplated in *Hudson,* that being "adequate" disclosure. A MEA nonmember, for example, can derive a simple bottom line percentage of total chargeable and nonchargeable expenditures, and a percentage of chargeable and nonchargeable expenditures for each of five major divisions within the MEA Section. A more sophisticated nonmember can glean considerably more.

For these reasons, and because I remain unconvinced that this information packet is faulty as argued by plaintiffs in their objections, I must grant defendant's motion for summary judgment. As applied, the notice provided—as a matter of law—is constitutionally adequate.

### JUDGMENT ORDER

In accordance with the opinion of this date;

IT IS HEREBY ORDERED that defendant MEA–NEA's March 2, 1989 Motion for Summary Judgment is GRANTED;

IT IS FURTHER ORDERED that plaintiffs' March 2, 1989 Motion for Class Certification is DENIED as moot.