30 F.3d 723
 146 L.R.R.M. (BNA) 2969, 93 Ed. Law Rep. 126
 William L. JIBSON; Patricia A. Benefiel; Robert F. Croll;
Robert E. Friar; Sandra B. Lewis; James E. Lindsey;
Harold M. Molter; George L. Stengren; David Stewart; and
Andrew J. Warber, on behalf of themselves and all others
similarly situated, Plaintiffs-Appellants,
v.
MICHIGAN EDUCATION ASSOCIATION-NEA, Defendant-Appellee.
 No. 93-1771.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 20, 1994.
Decided July 27, 1994.
 
 Andrew J. Vorbrich, Early, Lennon, Peters & Crocker, Kalamazoo, MI, Raymond J. LaJeunesse, Jr. (argued), Milton L. Chappell (briefed), National Right to Work Legal Defense Foundation, Springfield, VA, Sam F. Massie, Jr., Allaben, Massie, Vander, Weyden & Timmer, Grand Rapids, MI, for plaintiffs-appellants.
 Bruce R. Lerner (argued), Robert H. Chanin (briefed), Francis R. Sheed, Bredhoff & Kaiser, Washington, DC, Arthur R. Przybylowicz, James J. Chiodini, White, Beekman, Przybylowicz, Schneider & Baird, Okemos, MI, for defendant-appellee.
 Before: MARTIN, SUHRHEINRICH, and DAUGHTREY, Circuit Judges.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 This case involves yet another challenge to a labor arrangement sanctioned by the Michigan Public Employment Relations Act. Under the Act, any public school employee who is not a member of his or her local education association may be required nonetheless to pay a service fee to the local association for its costs of statutory exclusive representation. MICH.COMP.LAWS Sec. 423.211. In Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Supreme Court found this plan to be constitutionally sound, but recognized both the general principle "that requiring nonunion employees to support their collective-bargaining representative 'has an impact upon their First Amendment interests,' " and the nonmembers' specific "constitutional right to 'prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative.' " Chicago Teachers Union, Local No. 1 v. Hudson, 475 U.S. 292, 301-02, 106 S.Ct. 1066, 1073, 89 L.Ed.2d 232 (1986) (explaining and citing Abood, 431 U.S. at 222, 234, 97 S.Ct. at 1793, 1799). Subsequently, the Supreme Court considered in Hudson the adequacy of a procedure designed to protect the distinction drawn, in Abood, between those expenditures a union could and could not constitutionally charge to nonmembers. Hudson, 475 U.S. at 302, 106 S.Ct. at 1073. There, the Court concluded, id. at 310, 106 S.Ct. at 1077,
 
 
 2
 that the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending.
 
 
 3
 It is the first of these requirements--that the organization serving as the exclusive bargaining representative provide an adequate explanation of the basis for the fee--that is at issue in the instant case.
 
 
 4
 Michigan Education Association, referred to by the parties as "MEA," is an organization that represents approximately 127,000 Michigan public school employees for the purpose of negotiating collective bargaining agreements through more than 900 affiliated local education associations. In this action, ten Michigan public school employees brought suit against MEA pursuant to 42 U.S.C. Sec. 1983 on behalf of themselves and all other nonmembers required to pay a service fee to the organization. Plaintiffs allege that the notice MEA provided to nonmembers regarding the calculation of the amount of their service fees was constitutionally inadequate under the standard established in Hudson and its progeny, because it did not provide an adequate explanation of the basis for the fee amount.[1] Plaintiffs now appeal the district court's grant of MEA's motion to dismiss and/or for summary judgment, denial of their motion for summary judgment, and denial of their motion to alter or amend judgment and for reconsideration of judgment. For the following reasons, we affirm the judgment of the district court.
 
 
 5
 * A
 
 
 6
 Plaintiffs are employees of various public school districts, colleges, and universities in Michigan. For each of these public employers, a local education association that is affiliated with MEA and the National Education Association, referred to by the parties as "NEA," has been recognized as the exclusive bargaining representative for purposes of collective bargaining. Although plaintiffs are members of the bargaining units represented by these local associations, they chose not to join their respective local associations during the 1988-89 through 1991-92 school years.
 
 
 7
 In their capacity as exclusive bargaining representatives, the local associations entered into collective bargaining agreements with their respective public employers for the school years in question. As permitted by Michigan law, each of these collective bargaining agreements contained a provision requiring employees within the bargaining unit who were not members of the exclusive representative to pay a fee in lieu of dues for services rendered by the exclusive representative and its affiliated organizations. MICH.COMP.LAWS Secs. 423.210(1)(c) and (2).
 
 
 8
 Pursuant to these provisions, the local associations sought to collect a service fee from each of the nonmember employees in their bargaining units during the 1988-89 school year and in each subsequent school year. To collect these fees, the local associations followed a procedure--known as MEA's Policy and Procedures Regarding Objections to Political-Ideological Expenditures--that was adopted by MEA in January 1989. The procedure had been expressly approved, and found to satisfy all constitutional requirements, by the district court. See Lehnert v. Ferris Faculty Ass'n-MEA-NEA, 707 F.Supp. 1473 (W.D.Mich.1988), further proceedings, 707 F.Supp. 1482 (W.D.Mich.1988), and 707 F.Supp. 1490 (W.D.Mich.1989) ("Lehnert I "), aff'd, 893 F.2d 111 (6th Cir.1989), cert. denied, 496 U.S. 905, 110 S.Ct. 2586, 110 L.Ed.2d 267 (1990).[2]
 
 
 9
 The MEA procedure--which is reprinted as an appendix to the district court's opinion in Lehnert I, 707 F.Supp. at 1496-98--sets forth a comprehensive system for the collection of service fees from nonmember employees who are represented by local associations affiliated with MEA. The first part of that procedure, and the aspect that is directly relevant to this appeal, is the notice that is sent each school year to nonmember employees. Specifically, after MEA calculates the amount of the reduced service fee that it believes objecting nonmember employees are legally required to pay, MEA provides all nonmember employees with a notice explaining the basis for that service fee calculation. As expressly stated in the MEA procedure, that notice is designed to include "adequate information identifying the NEA's, MEA's and local associations' total expenditures [that is] sufficient to enable [all nonmembers] to assess the propriety of the service fee calculation." The MEA procedure also specifically states what information must be included in the notice that is sent to all nonmember employees:(1) A list of expenditures made by the NEA and MEA, by major category, during the [relevant] fiscal year verified by an independent auditor and an identification of whether the major category of expense, or a particular portion thereof, is chargeable to objectors;
 
 
 10
 (2) In those instances where a local association service fee is collected, a list of the local association's major categories of expenditures verified by an independent auditor and an identification of whether the major category of expense, or a particular portion thereof, is chargeable to objectors shall be provided;
 
 
 11
 (3) The amount of the reduced agency fee;
 
 
 12
 (4) The method used to calculate the reduced agency fees; and
 
 
 13
 (5) A copy of this procedure.
 
 
 14
 After receiving the information described above, each nonmember employee has thirty days within which to file a written objection to the amount of the service fee. No nonmember is required to pay any portion of the fee until the thirty-day period has expired. An objection may be stated in general terms, and a nonmember need not single out any particular reason for his or her objection.
 
 
 15
 A nonmember who objects to the amount of the service fee may take either of two positions. He or she may object to the amount of the full service fee but accept MEA's calculation of the reduced fee, or object to both the full fee and MEA's reduced service fee calculation. An objector who chooses the first option is charged the reduced fee, and that amount is forwarded to MEA. An objector who chooses the second option, and disputes MEA's reduced fee as well, is in the first instance charged the reduced service fee as calculated by MEA, but the entire amount of his or her reduced fee is placed in an interest-bearing escrow account until an impartial decisionmaker chosen by the American Arbitration Association issues a decision on the exact proportion of the fee that is lawfully chargeable to objecting nonmember employees. Each nonmember is provided with a simple form on which to indicate his or her objection, and a business reply envelope in which to return the form to MEA.
 
 
 16
 In light of the decision in Lehnert I, plaintiffs in this case do not mount a facial challenge to the constitutional validity of the notice provisions called for by the MEA procedure. Instead, they contest the implementation of those notice provisions by MEA, and they object in particular to the adequacy of the information that was actually included in the notices MEA sent to nonmember employees between 1989 and 1992. Because the contents of these notices is the central issue in this appeal, the following is a detailed description of the specific information and documents included in these mailings.[3]
 
 
 17
 The first document included in the January 1989 notice was a cover letter from MEA that indicated the purpose of the notice and provided the nonmember employee with an outline of the remaining documents. This cover letter explained exactly what a nonmember was required to do in order to file a timely objection to the amount of the service fee--i.e. "you must complete and return the Service Fee Election Form[, which] must be personally delivered or mailed and postmarked no later than February 16, 1989 to the Michigan Education Association."
 
 
 18
 The remainder of the notice was comprised of a packet of material that was divided into five parts (Section A through Section E). Section A contained a copy of the MEA procedure. This document reiterated the purpose and contents of the notice, and provided a detailed explanation of the procedure that would be followed by MEA and its local affiliates to collect the service fee.
 
 
 19
 Sections B, C, and D specifically described the portions of the service fee chargeable to objecting nonmember employees by MEA, NEA, and the local association, respectively. Section B, containing information with regard to MEA, was itself divided into four parts. First, Section B-1--entitled "MEA Explanation of Chargeable Fee for the 1988-89 Fiscal Year"--explained how the portion of the service fee attributable to MEA was calculated. It listed twenty-nine separate activities of MEA, and categorized twenty-two of them as nonchargeable. For example, negotiating a collective bargaining agreement was listed as a chargeable activity, while supporting or contributing to a charitable organization was categorized as nonchargeable.[4]
 
 
 20
 This document also provided nonmembers with an overview and summary of the five major operating divisions of MEA, and described their respective functions. Finally, the document explained the process used by MEA to divide its expenditures into major categories of chargeable and nonchargeable activities, and to calculate MEA's portion of the service fee based on that categorization.
 
 
 21
 Sections B-2 and B-3 contained a written explanation, as well as a copy, of MEA's Reduced Service Fee Table. This table disclosed the actual dollar amounts expended by each of the five divisions of MEA on chargeable matters, grouped into three major categories.[5] The table further explained that MEA intended to charge objecting nonmember employees a reduced service fee of $257.35 (compared to full MEA dues of $275.20), based on MEA's determination that 95.33% of its total expenditures were spent on legally chargeable activities.[6] To assist the nonmember in interpreting the financial information included in the table, MEA also provided a written explanation of the table (in Section B-2) and a separate opinion letter from an independent accountant (in Section B-3) that verified the dollar amounts reflected in the table. Finally, Section B-4 of the notice sent to nonmember employees contained MEA's regular year-end Report on Financial Statements, which also was verified by an independent accountant.
 
 
 22
 In Sections C and D of the notice, nonmembers were provided with similar information for NEA and those local associations that were collecting a service fee. In particular, Section C contained two subparts that together explained the basis for NEA's determination that 75.39% of its portion of the service fee was expended on legally chargeable activities.[7] Section C-1--entitled "How NEA Calculates Its Agency Fee Chargeable/Nonchargeable Expenditures"--initially set forth the criteria that NEA used to determine chargeable and nonchargeable expenditures, including a list of twelve categories of activities deemed chargeable and nine categories of activities deemed nonchargeable. This document then provided nonmembers with a breakdown of chargeable and nonchargeable expenditures by program and administrative area. The second NEA document--in Section C-2--contained NEA's Financial Statements and Supplemental Schedules, as reviewed by an independent accountant. Much like the financial statements regarding MEA, these audited materials included a breakdown of NEA expenditures that specifically included a "Schedule of Agency Fee Chargeable and Nonchargeable Expenditures." This schedule listed the dollar amounts for chargeable and nonchargeable expenditures in each of NEA's program and administrative areas, and contained accompanying notes that again specified particular activities that NEA deemed to be chargeable and nonchargeable.
 
 
 23
 Section D of the notice included information with regard to the local association, but this information differed depending upon which local association served as the nonmember's exclusive representative. If the local association had not commissioned an independent audit of its financial records, then the nonmember was informed that he or she was not required to pay any portion of the service fee attributable to the local association. If, on the other hand, the relevant local association had engaged an independent accountant to verify its financial records, then the nonmember was provided financial information with regard to that local association in a format that used the same chargeability categories as the MEA material (except that expenditures were not broken down by operation divisions, because local associations do not have divisions).
 
 
 24
 Finally, the notice sent to each nonmember contained, in Section E, a Service Fee Election Form that informed the nonmember of the precise amount of the reduced service fee, and allowed the nonmember, if he or she chose not to pay the full service fee, either to object to the full fee and accept MEA's calculation of the reduced fee, or to object to MEA's calculation of the reduced fee, merely by checking a box to that effect. Attached to this form was a business reply envelope, postage prepaid, in which the nonmember could return the form to MEA.
 
 
 25
 In short, the notices mailed to all nonmember employees in January 1989, November 1989, November 1990, and December 1991 included specific categories of activities deemed by MEA, NEA, and (in the relevant cases) the local association to be chargeable and nonchargeable, as well as independently audited financial reports identifying dollar amounts in each association's functional divisions or program areas that were expended on chargeable activities. The notices also provided all nonmembers with a simple procedure by which to lodge an objection to the associations' chargeability determinations.
 
 B
 
 26
 On February 14, 1989, plaintiffs brought suit under 42 U.S.C. Sec. 1983, alleging that MEA's notice regarding the fee for the 1988-89 school year was insufficient under Hudson and violated the constitutional rights of all nonunion Michigan public employees represented by MEA affiliates. On February 15, the district court denied plaintiffs' motion for a temporary restraining order to enjoin MEA from collecting any service fees until the district court ruled on the constitutionality of the notice sent to nonmembers. On March 22, following a hearing, the court denied plaintiffs' motion for a preliminary injunction to the same effect, on the ground that the notice provided to the nonmembers met the constitutional requirements of Hudson and its Sixth Circuit progeny--Tierney v. City of Toledo, 824 F.2d 1497 (6th Cir.1987) ("Tierney II "), and Damiano v. Matish, 830 F.2d 1363 (6th Cir.1987)--and thus plaintiffs' success on the merits was unlikely.
 
 
 27
 Concluding that the notice provided by MEA was constitutionally adequate as a matter of law, the district court granted MEA's motion for summary judgment on August 2, and consequently denied plaintiffs' motion for class certification as moot. Plaintiffs then filed a timely appeal, and the case was briefed and argued before a panel of this Court. While the case was under consideration by this Court, the Supreme Court issued its decision in Lehnert v. Ferris Faculty Association, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), the constitutional challenge by nonmembers serving on the faculty of Ferris State College in Big Rapids, Michigan to the chargeability of certain union expenditures and thus to the amount of the actual service fee charged by MEA. Accordingly, in an unpublished per curiam opinion, this Court remanded the present case to the district court to be considered in light of the Supreme Court's Lehnert decision. See Jibson v. Michigan Education Ass'n-NEA, No. 89-2060, 1991 WL 100634, at * 3, 1991 U.S.App.LEXIS 12257, at * 3 (6th Cir. June 11, 1991) (mandate remanding case).
 
 
 28
 On January 13, 1992, plaintiffs filed an Amended Complaint, adding a challenge to the notices sent to plaintiffs by MEA for the three school years subsequent to the filing of the original complaint (i.e. 1989-90, 1990-91, 1991-92), and renewed their request for class certification. On December 8, the district court granted MEA's motion to dismiss and/or for summary judgment, denied plaintiffs' motion for summary judgment, and denied plaintiffs' renewed motion for class certification as moot. Notwithstanding the fact that the district court had previously issued a judgment by consent dismissing that case with prejudice, the court simultaneously issued an order in Lehnert, which was before the court on remand from the Supreme Court, requiring MEA to distribute an accounting of union expenditures made prior to the Supreme Court's decision, and to refund any overpayments to nonmembers.
 
 
 29
 On April 28, 1993, the district court granted MEA's motion to dissolve the court's December 8, 1992, order in Lehnert, noting that the court had indeed divested itself of jurisdiction in that case in December 1991 by entering the consent judgment. In addition, the court denied plaintiffs' motion seeking reconsideration of the court's grant of MEA's motion to dismiss and/or for summary judgment. This timely appeal followed.
 
 II
 
 30
 * In its December 8, 1992, grant of MEA's motion to dismiss and/or for summary judgment, the district court expressly reaffirmed its August 2, 1989, decision granting summary judgment to MEA. As a result, we will treat the December 8 order as a grant of summary judgment under Federal Rule of Civil Procedure 56, rather than as a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and conduct a de novo review of the evidence in the entire record. National Rifle Ass'n v. Handgun Control Fed'n, 15 F.3d 559, 561 (6th Cir.1994) (review of Rule 56 summary judgment). Summary judgment is proper only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). We view all evidence before us in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 
 
 31
 * A public sector union that seeks to collect a service, or agency, fee from nonmembers must provide prior notice that adequately explains "the basis for the fee." Hudson, 475 U.S. at 310, 106 S.Ct. at 1078. As the district court noted here, "adequate disclosure ensures that potential objectors will be able to assess the propriety of the union's fee and decide in a reasoned fashion whether to object." Jibson v. Michigan Education Ass'n-NEA, 719 F.Supp. 603, 606 (W.D.Mich.1989).
 
 
 32
 Plaintiffs initially maintain that MEA's notices did not correctly describe what union activities are constitutionally chargeable, and thus necessarily failed to provide a constitutionally adequate explanation of the basis for the service fee. In support of this argument, plaintiffs rely in large part on this Court's mandate remanding this case for reconsideration in light of the "determination by the Supreme Court [in Lehnert ][8] that MEA's collection procedures inappropriately charged certain union activities to nonmember employees." Jibson, 1991 WL 100634, at * 1, 1991 U.S.App.LEXIS 12257, at * 3. According to plaintiffs, the decision to remand their case, which challenges solely the adequacy of the actual notice provided by MEA, on the ground stated in the mandate constitutes an implicit holding that whether a service fee notice is adequate under Hudson depends, in part, on whether the notice on its face complies with the Supreme Court's test for chargeable activities. Plaintiffs also note the district court's observation that following the Supreme Court's decision in Lehnert, "adequate notice of constitutional billing practices will look different than it did before," and the district court's conclusion that MEA's 1991-92 notice "was in compliance with Hudson and Lehnert. " Jibson v. Michigan Educational Ass'n-NEA, No. 91:89:CV:147, 1992 WL 510404, at * 3, * 6, 1992 U.S.Dist.LEXIS 21273, at * 8, * 17 (W.D.Mich. Dec. 8, 1992). Finally, in further support of the premise that adequacy of a notice is contingent upon the correct identification therein of activities as chargeable or nonchargeable, plaintiffs observe that this Court concluded that a notice procedure was unconstitutional because, in part, it increased the risk that a reduced fee collection from an objecting nonmember would be in excess of what is appropriate, as would presumably a notice that treated nonchargeable activities as chargeable. See Lowary v. Lexington Local Bd. of Educ., 903 F.2d 422, 431-32 (6th Cir.) ("Lowary II ") (disallowing the use of a so-called "local union presumption," under which the chargeable portion of local teacher union dues is presumed to be the same as the chargeable portion of state teacher union dues), cert. denied, 498 U.S. 958, 111 S.Ct. 385, 112 L.Ed.2d 396 (1990).
 
 
 33
 Turning to the actual notices sent by MEA to nonmembers, plaintiffs make separate arguments concerning those notices sent before and after the Lehnert decision. First, plaintiffs maintain that the pre-Lehnert notices (i.e. those for 1988-89, 1989-90, and 1990-91) improperly treated as chargeable to nonmembers expenditures for lobbying efforts not concerned with the "legislative ratification of, or fiscal appropriations for, their collective-bargaining agreement," as well as expenditures for public relations activities. Lehnert, 500 U.S. at 519-23, 526-30, 111 S.Ct. at 1959-61, 1963-64, 114 L.Ed.2d 572. Next, plaintiffs contend that the post-Lehnert notice (i.e. that for 1991-92) impermissibly charged nonmembers for lobbying and litigation activities not undertaken solely for the benefit of each nonmember's own particular bargaining unit.[9]
 
 
 34
 At the outset, we disagree with plaintiffs' premise that the constitutional validity of a notice is contingent upon the accuracy of the chargeability determinations within the notice. That assertion is fundamentally flawed precisely because it rejects the clear distinction between the adequacy of a union's notice, addressed by the Supreme Court in Hudson, and the propriety of a union's chargeability determinations, considered separately by the Supreme Court in Lehnert. See Lehnert, 500 U.S. at 515-18, 111 S.Ct. at 1957-58 (focusing its preliminary discussion on Abood, the Court's prior decision also regarding chargeability, rather than on Hudson ). Addressing a similar attempt to convert notice issues into chargeability issues in the remand of the Hudson case itself, the Seventh Circuit agreed "with the district court's assessment that the plaintiffs' challenge 'mistakenly equates the adequacy of the notice with the accuracy of the fee assessment,' " and reasoned further that the Supreme Court's Hudson decision "did not contemplate that federal courts would be required, on the basis of the notice, to pass on the legality and accuracy of every element of the fee calculation before any fees could be collected." See Hudson v. Chicago Teachers Union, Local No. 1, 922 F.2d 1306, 1314 (7th Cir.) (citation omitted), cert. denied, 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991).
 
 
 35
 On several occasions, this Court has ruled consistently with the Seventh Circuit's holding on remand in Hudson. Recently, for example, we expressly rejected a claim by dissenting nonmembers that issues of chargeability become issues of notice, and cannot be considered by an arbitrator, when "the union clearly notifies nonmember employees it is charging them for expenses which either are not chargeable under existing precedent or are subsequently found not to be chargeable." Weaver v. University of Cincinnati, 970 F.2d 1523, 1536 (6th Cir.1992) ("Weaver II "), cert. denied, --- U.S. ----, 113 S.Ct. 1274, 122 L.Ed.2d 668 (1993)[10] ; see also Weaver v. University of Cincinnati, 942 F.2d 1039, 1043 n. 1 (6th Cir.1991) ("Weaver I ") (stating that, because that dispute involved a challenge only to the union's agency fee notices, the outcome of the case was not affected by the three-part chargeability test for determining the accuracy of the fee assessment articulated by the Supreme Court in Lehnert ); Tierney v. City of Toledo, 917 F.2d 927, 935 (6th Cir.1990) ("Tierney III ") (concluding that because ensuring adequate disclosure is materially different from determining whether particular expenditures are chargeable as part of the fee assessment, the latter questions were not presented to the Court upon its review of the sufficiency of the union's notices). Thus, we hold that if a service fee notice accurately informs nonmembers that the union proposes to charge them for a particular matter, which has not been clearly held nonchargeable, the fact that the matter in question is subsequently held to be lawfully nonchargeable does not render the notice constitutionally deficient under Hudson.
 
 
 36
 Our mandate remanding this case and our holding in Lowary II are not inconsistent with the above proposition. First, in remanding this case for reconsideration, this Court simply provided the plaintiffs with an opportunity to convince the district court that it should amend its rulings with regard to the constitutionality of MEA's notices in light of Lehnert. Though we may have acted in an abundance of caution, by issuing the mandate we by no means decreed, as plaintiffs suggest, that a notice that incorrectly charges a nonmember for a nonchargeable expenditure is inadequate as a matter of law. Placing undue weight on a single statement in Lowary II, plaintiffs similarly misinterpret the holding of that case. In Lowary II, we did agree with the observation that a local union presumption increases the risk that the reduced fee collection from an objecting nonmember would be in excess of what is appropriate. Lowary II, 903 F.2d at 430. Our primary holding in that case, however, was that use of the union presumption at issue violated the requirement of adequate notice because it permitted "the unions to avoid providing audited and detailed financial statements to nonmembers concerning the local and district union affiliates." Id. Contrary to plaintiffs' assertions, this determination and our single statement regarding the increased risk of an excessive reduced fee collection does not support the theory that a notice necessarily violates Hudson if it provides "audited and detailed financial statements," but also indicates that the union intends to charge nonmembers for a matter that is lawfully nonchargeable.
 
 
 37
 With respect to the actual notices sent by MEA to nonmembers, we consider in turn those notices sent before and after the Lehnert decision. Initially, we agree with the district court that the pre-Lehnert notices (i.e. those for 1988-89, 1989-90, and 1990-91) "complied with the constitutional standard enunciated in the Hudson line of cases ... given the legal standards of chargeability in effect at the time they were issued. " Jibson, 1992 WL 510404, at * 3, 1992 U.S.Dist.LEXIS 21273, at * 7. Plaintiffs correctly note, and MEA concedes, that the Lehnert decision subsequently found nonchargeable certain activities treated by the notices as chargeable. Plaintiffs did not show, however, and indeed could not have shown, that the activities in question had been clearly held nonchargeable prior to the issuance of the notices. As a result, MEA's error in designating the activities in question as chargeable is of no constitutional significance, and plaintiffs' challenge to these notices in this respect must fail.
 
 
 38
 Second, plaintiffs' contention that the Supreme Court in Lehnert held extra-unit lobbying and litigation nonchargeable, and that MEA's subsequent 1991-92 notice was therefore constitutionally inadequate because it treated these activities as chargeable to nonmembers lacks merit. Justice Blackmun's plurality opinion in Lehnert, which was joined in pertinent part by three other justices, expressly prohibited the use of dissenting nonmembers' fees for extra-unit litigation. Lehnert, 500 U.S. at 526-30, 111 S.Ct. at 1963-64. In addition, the plurality ruled that nonmembers "may not be charged over their objection for lobbying activities that do not concern legislative ratification of, or fiscal appropriations for, their collective-bargaining agreement." Id. at 519, 111 S.Ct. at 1959 (emphasis added). Plaintiffs, however, are only able to conclude that a majority of the Supreme Court disallowed extra-unit lobbying and litigation by further arguing that Justice Scalia, whose concurrence was joined by three other members of the court, also implicitly joined the plurality rulings on these issues. MEA, by contrast, argues that Justice Scalia implicitly found both extra-unit litigation and lobbying to be chargeable. Because Justice Marshall came to a similar conclusion regarding these activities in his dissent, MEA contends that a majority of the Supreme Court in Lehnert in fact found both extra-unit lobbying and litigation chargeable, and thus MEA's 1991-92 notice did not charge nonmembers for any nonchargeable expenditures. For the purposes of this opinion we need not resolve this dispute. Given that plaintiffs' argument is dependent upon their mere speculation as to how certain justices would have ruled on issues they did not actually reach, we are convinced that Lehnert did not clearly hold extra-unit lobbying and litigation nonchargeable. Accordingly, any potentially erroneous designation of these activities as chargeable in the 1991-92 notice was not of constitutional significance, and plaintiffs' challenge to the post-Lehnert notice in this respect is without merit.
 
 2
 
 39
 Plaintiffs argue that all of the notices provided by MEA were constitutionally inadequate because they listed union expenditures in ambiguous categories that were neither sufficiently relevant nor detailed enough to allow nonmembers to assess intelligently the propriety of the service fee charged. Specifically, plaintiffs contend that MEA's failure to identify the precise dollar amounts expended for chargeable and nonchargeable litigation and lobbying prevented nonmembers from determining whether enough funds were at issue to make an objection to the service fee worth pursuing. In short, plaintiffs maintain that in addition to a verification of the expenditures by an independent accountant, which plaintiffs concede MEA did provide, Hudson requires an explanation of the reasons why nonmembers are required to pay a particular share of each of the major categories of union expenditures, which MEA did not provide. We disagree.
 
 
 40
 Hudson only requires that nonmembers "be given sufficient information to gauge the propriety of the union's fee," and that they are not left "in the dark about the source of the figure" for the fee. Hudson, 475 U.S. at 306, 106 S.Ct. at 1075-76. The Hudson notice requirement is limited in nature so as to avoid imposing an undue burden on the union, and because a nonmember need only "make his objection known" to mount a challenge to the amount of the service fee. Id. at 306 n. 16, 106 S.Ct. at 1076 n. 16. As this Court has observed, the Supreme Court in Hudson "specifically noted that the union need not provide nonmember employees with an exhaustive and detailed list of all its expenditures and that 'absolute precision' in the union's calculation of the fair share fees was not expected or required." Gwirtz v. Ohio Education Ass'n, 887 F.2d 678, 682 (6th Cir.1989) (citing Hudson, 475 U.S. at 306, 307 n. 18, 106 S.Ct. at 1075-76, 1076 n. 18), cert. denied, 494 U.S. 1080, 110 S.Ct. 1810, 108 L.Ed.2d 941 (1990). We have also made clear that the mere fact that one type of financial disclosure provides "better" or more detailed information does not mean that the union is constitutionally required to provide that type of financial disclosure to nonmembers. Gwirtz, 887 F.2d at 682. Given these standards, we conclude that all of MEA's notices at issue provided each nonmember with sufficient information to "permit [him] to enter an intelligent and informed objection to the use of his service fees if he desire[d]." Damiano, 830 F.2d at 1370. Thus the notices were constitutionally adequate as a matter of law.
 
 3
 
 41
 In discussing the adequate accounting that all nonmembers must receive, this Court in Tierney II made reference to "the difference," or those expenses that are neither undeniably for ideological purposes, and thus nonchargeable, nor indisputably related to the negotiation and administration of the collective bargaining agreement, and thus chargeable. Tierney II, 824 F.2d at 1504. Based solely on this reference, plaintiffs contend that all union notices must identify three components of expenditures: nonchargeable, chargeable, and arguably chargeable. Because MEA's notices divided union expenses only into those that were chargeable and nonchargeable, and did not identify those that were only arguably chargeable, plaintiffs argue that the notices were constitutionally inadequate as a matter of law. We are not persuaded.
 
 
 42
 We agree with the district court's eloquent rationale for rejecting this argument:
 
 
 43
 In fact, Tierney does not explicitly mandate expenditures be disclosed in three components. The explicit language mandates two components:
 
 
 44
 [All] nonmembers must receive an adequate accounting, certified by an independent auditor and setting forth the major categories of the union's budgeted expenses, that enables a non-consenting employee to intelligently appraise what proportion of his dues would be allocable to the costs of negotiating and administering the collective bargaining agreement and that portion which would advance the union's ideological purposes.
 
 
 45
 Tierney, 824 F.2d at 1504 (emphasis added). Thus the accounting must inform the proportion of dues allocable to one, the collective bargaining portion, and two, the ideological portion. Further into the discussion, and in the context of escrowing funds, Tierney states that "with regard to the difference [between collective bargaining and ideological expenditures], we conceive that Hudson contemplates that to the extent the union asserts its right to retain and employ such monies, and the objecting non-union members dispute that right, all such monies should be held in escrow pending resolution by an impartial decisionmaker." Tierney, 824 F.2d at 1504 (emphasis added). The Sixth Circuit in Tierney, then, allows for escrowing options based on whether the union chooses to have immediate access to the collective bargaining portion of the dues. For the purposes of escrowing, the individual fee may be divided into two (clearly ideological/non clearly ideological) or three (clearly ideological/clearly collective bargaining/remaining amount) portions. Id.
 
 
 46
 The Sixth Circuit went on to say that there is a gray area for many expenses that may concurrently advance both or neither of the two components. According to Tierney, the impartial decisionmaker should expect such issues and the escrowing procedure used by the union should not automatically include a doubtful, or gray, expenditure in the non-member's fair share service fee. While it is clear that the Sixth Circuit considered as unlikely expenditures which easily fall into two mutually exclusive components, the language speaks to the administrative decision and the escrowing procedure, but not to the constitutional minimum for notice. Id. (The arbitrator should be aware of "internal tension" in Hudson that the "gray area" may be subject to dispute).
 
 
 47
 Jibson, 719 F.Supp. at 608-09. Accordingly, plaintiffs' claim that MEA's notices were constitutionally inadequate because they divided union expenditures only into those that were chargeable and nonchargeable, and did not identify "the difference," must fail.
 
 B
 
 48
 Based on the rule of law established in Lehnert, plaintiffs maintain that MEA's notices for 1988-89, 1989-90, and 1990-91 were constitutionally inadequate, and that they are thus entitled to relief in the form of a refund of the nonchargeable part of the agency fee they paid, a declaratory judgment, nominal damages, and attorney's fees. See Weaver II, 970 F.2d at 1528 (proper remedy for unconstitutional fee collection is refund of portion of exacted fees proportionate to union's nonchargeable expenditures). As previously noted, however, Lehnert addressed only the chargeability of certain activities and did not find MEA's pre-Lehnert notices constitutionally inadequate. Therefore, the district court did not err in denying the plaintiffs any remedy.
 
 
 49
 Plaintiffs further maintain that the district court erred in dismissing plaintiffs' motion for class certification as moot, and that all nonmembers who received the constitutionally inadequate pre-Lehnert notices are also eligible for relief. We disagree. The district court's grant of summary judgment resolved the sole issue in this case--the constitutional adequacy of the notices--in MEA's favor. Accordingly, because we affirm the district court's grant of MEA's motion for summary judgment, we also find that the district court did not err in subsequently refusing to rule on the motion for class certification, and in not granting any relief to the other purported class members. See Marx v. Centran Corp, 747 F.2d 1536, 1552 (6th Cir.1984) (district court not required to determine whether complaint could be properly maintained as class action before ruling on merits of case), cert. denied, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985); Gwirtz, 887 F.2d at 683 (agreeing with district court that union provided constitutionally sufficient notice, finding that district court did not err in refusing to rule on plaintiffs' motion for class certification, and, given affirmance of district court's substantive ruling, declining to order district court to nonetheless certify class of plaintiffs).[11]
 
 III
 
 50
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 
 [1]
 An act passed by the Michigan legislature in December 1993 allows nonprofit entities to establish a new breed of independent public schools called charter schools. See 1993 Mich.Pub. Acts 284. We note with more than a little trepidation that this development will in all likelihood only add fuel to the litigation fire that the nonmembers here have so carefully stoked for the past sixteen years
 
 
 [2]
 Lehnert I rejected a challenge by nonmembers to the constitutionality of the procedure used by the MEA to collect service fees. Nonmembers mounted a separate constitutional challenge to the chargeability of certain union expenditures and thus to the amount of the service fees actually charged by MEA. See Lehnert v. Ferris Faculty Ass'n-MEA-NEA, 643 F.Supp. 1306 (W.D.Mich.1986) ("Lehnert II "), aff'd, 881 F.2d 1388 (6th Cir.1989), aff'd in part, rev'd in part, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991)
 
 
 [3]
 Plaintiffs' Amended Complaint challenges the validity of the notices sent in November 1989, November 1990, and December 1991, as well as the January 1989 notice challenged in their initial Complaint. These four notices are essentially identical, except that the notices reflect the fact that certain chargeability determinations were revised in the December 1991 notice to take into account the Supreme Court's decision in Lehnert II. Thus, the following description of the contents of the January 1989 notice also describes the other notices that are being challenged in this case
 
 
 [4]
 As noted earlier, the 1991-92 notice contained revisions in the categories of chargeable and nonchargeable activities to reflect the Supreme Court's opinion in Lehnert II. Accordingly, it listed nineteen activities as chargeable and eleven as nonchargeable, thus comprising a total of thirty categories of expenses
 
 
 [5]
 As described in Section B-2 of the 1988-89, 1989-90, and 1990-91 notices, these three major categories of chargeable expenditures reflected the following activities for each division of MEA:
 The first category identifies collective bargaining expenditures which include costs incurred in preparation for bargaining, bargaining sessions, training for bargaining, fact finding, mediation, public relations activities relating to bargaining, and similar bargaining related activities.
 The second major category of chargeable expenditures includes costs incurred for grievances and arbitrations and administration of collective bargaining agreements. Also included in this category are activities involving tenure, workers' compensation, retirement, unemployment compensation, certification, licensing and job security as well as activities designed to improve an employee's performance and relations with his or her employer. This category also includes lobbying activities on funding, appropriations, collective bargaining, retirement and other laws affecting public employment in education.
 The third category involves activities and expenditures incurred to strengthen and protect existing bargaining units including workshops, training sessions, and other research activities. In addition this category includes activities engaged in or expenditures incurred to ensure the satisfactory operation of the organization. Included in this category would be certain staff meetings, staff evaluations, conventions, the representative assembly, board meetings, and other administrative and governance activities and expenditures necessary for the operation of the organization.
 As a result of the Supreme Court's analysis in Lehnert II, the first category listed in the pre-Lehnert notices was changed in the 1991-92 notice by the exclusion of "public relations activities relating to bargaining." The third category was not changed. The second category was changed substantially, so that, following the first sentence, it read:
 Also included in this category are activities involving advice and assistance to bargaining unit members regarding employment rights and job security issues, as well as activities designed to improve an employee's performance and relations with his or her employer.
 
 
 [6]
 Ninety-five point three percent (95.3%) of $275.20 is $262.35. An additional $5 was deducted to provide a "cushion" against any inadvertent errors that might have been made by MEA in its chargeability calculations. The record on appeal does not reflect any consistent calculations for the reduced service fees for the 1989-90 and 1991-92 notices. MEA does contend, however, that the 1990-91 reduced service fee was $317.25, or 95.97% of the full MEA dues of $333.70 minus a $3 cushion
 
 
 [7]
 According to MEA, the comparable figure in 1989-90 was 76.15%; in 1990-91, 76.96%; and in 1991-92, 67.67%
 
 
 [8]
 This ruling represented the culmination of the line of "chargeability" cases referred to earlier in this opinion as "Lehnert II. " For the sake of convenience, all subsequent references to simply "Lehnert " are to this decision by the Supreme Court, reported at 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572
 
 
 [9]
 MEA concedes that the pre-Lehnert notices incorrectly treated certain activities as chargeable, but, as discussed infra, vigorously contests this argument with respect to the post-Lehnert notice
 
 
 [10]
 As we further noted in Weaver II, allowing nonmembers to convert chargeability issues into notice issues "would eliminate entirely the valuable role arbitrators play in evaluating fair share agreements." Id. at 1536; see also Tierney v. City of Toledo, 917 F.2d 927, 935 (6th Cir.1990) ("Tierney III ") (noting that the issue of whether particular expenditures were chargeable in that case was for the arbitrator in the first instance)
 
 
 [11]
 We have considered plaintiffs' remaining allegation, that the district court erred in denying their motion to alter or amend judgment and for reconsideration of judgment, and find it to be without merit